# 14-3700-cv

# United States Court of Appeals
## for the
## Second Circuit

FORWARD INDUSTRIES, INC.,

*Plaintiff-Appellant,*

– v. –

TERENCE BERNARD WISE, JENNY P. YU,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

# BRIEF AND SPECIAL APPENDIX
# FOR PLAINTIFF-APPELLANT

OLSHAN FROME WOLOSKY LLP
*Attorneys for Plaintiff-Appellant
    Forward Industries, Inc.*
65 East 55th Street
Park Avenue Tower
New York, New York 10022
(212) 451-2300

**CORPORATE DISCLOSURE STATEMENT**

The appellant in this appeal is Forward Industries, Inc., a publicly-held corporation whose shares are traded on the NASDAQ-Capital Market under the symbol FORD. Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and to assist judges in making a determination of whether they have interests in any of a party's related corporate entities that would disqualify the judges from hearing the appeal, Forward Industries, Inc. affirms that it has no parent company and that no publicly-held corporation owns 10% or more of its stock.

Table of Contents

Page

Statement of Jurisdiction................................................................1

Statement of the Issue Presented for Review...............................2

Standard of Review.......................................................................2

Statement of the Case....................................................................2

The Allegations of the Complaint.................................................3

    A.    The Parties. .........................................................3

    B.    Wise and Yu Control
              Forward's Supply Chain.......................................4

    C.    Wise Nominates Yu to Forward's Board
              and Yu Attends Board Meetings. ..........................5

    D.    Wise's Acquisition of Twenty Percent of
              Forward's Outstanding Securities Triggers
              New York's Anti-Takeover Statute.......................5

    E.    Yu Begins to Acquire Forward Shares After Wise
              Reaches New York's Anti-Takeover Statutory Threshold. .................7

    F.    Wise's and Yu's Understanding
              Regarding Their Forward Investment. ..................7

    G.    Wise Moves to Take Over Forward
              Without Disclosing the Wise-Yu Group. ..............9

The Proceedings Below ...............................................................10

Table of Contents
(continued)

Page

Summary of Argument............................................................................13

Argument.................................................................................................14

THE DISTRICT COURT ERRED IN DISMISSING
THE COMPLAINT FOR FAILURE ADEQUATELY
TO ALLEGE A GROUP UNDER SECTION 13(d) ...................................15

    A.    Section 13(d) Is to Be Broadly Construed. ...............................15

    B.    The Hallmark of a Section 13(d) Group
        Is a Combination with a Common Objective. ...........................18

    C.    The Complaint Adequately Alleges a
        Reportable Wise-Yu Group. .....................................................19

    D.    The District Court's Opinion Is Based
        on Flawed Logic and Inapposite Authority. .............................26

Conclusion .............................................................................................34

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements...........................35

2864418-1

Table of Authorities

Page

CASES

*Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*,
737 F.3d 166 (2d Cir. 2013) ........................................................ 14-15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................... 15

*Bank of Am. Nat'l Trust Sav. Ass'n v. Douglas*,
105 F.2d 100 (D.C. Cir. 1939) ......................................................... 16

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ............................................................ 15

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
654 F.3d 276 (2d Cir. 2011) ............................................................ 18

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ......................................................................... 15

*GAF Corp. v. Milstein*,
453 F.2d 709 (2d Cir. 1971) ................................................. 17, 20-21

*Guippone v. BH S & B Holdings LLC*,
737 F.3d 221 (2d Cir. 2013) .............................................................. 2

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
286 F.3d 613 (2d Cir. 2002) .......................................................17, 18

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
95 F. Supp. 2d 169 (S.D.N.Y. 2000) .......................................... 31-33

*Log On America, Inc. v. Promethean Asset Mgmt LLC*,
223 F. Supp. 2d 435 (S.D.N.Y. 2001) .............................................. 27

*meVC Draper Fisher Jurvetson Fund I, Inc. v.
Millennium Partners, L.P.*,
260 F. Supp. 2d 616 (S.D.N.Y. 2003) ......................................... 27-28

Table of Contents
(continued)

Page

*Morales v. Freund*,
    163 F.3d 763 (2d Cir. 1999) .........................................................19, 28

*Morales v. Quintel Entm't, Inc.*,
    249 F.3d 115 (2d Cir. 2001) ......................................................passim

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) .........................................................18, 19

*S.E.C. v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963).............................................................................16

*SEC v. Savoy Indus., Inc.*,
    587 F.2d 1149 (D.C. Cir. 1978)................................................... 16-17

*Southmark Prime Plus, L.P. v. Falzone*,
    776 F. Supp. 888 (D. Del. 1991)......................................................16

*Strauss v. American Holdings, Inc.*,
    902 F. Supp. 475 (S.D.N.Y. 1995) .............................................. 24-25

*Sweet v. Sheahan*,
    235 F.3d 80 (2d Cir. 2000) ................................................................15

*Transcon Lines v. A.G. Becker Inc.*,
    470 F. Supp. 356 (S.D.N.Y. 1979) ...................................................26

*Wellman v. Dickinson*,
    475 F. Supp. 783 (S.D.N.Y. 1979),
    *aff'd* 682 F.2d 355 (2d Cir. 1982)....................................................16

*Wellman v. Dickinson*,
    682 F.2d 355 (2d Cir. 1982),
    *cert. denied* 460 U.S. 1069 (1983)......................................... 18-19, 28

STATUTES AND OTHER AUTHORITIES

15 U.S.C. §§ 78aa ...................................................................................1

iv

Table of Contents
(continued)

Page

15 U.S.C. § 78m ................................................................................18, 23

28 U.S.C. § 1291 ......................................................................................2

28 U.S.C. § 1294 ......................................................................................2

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1332 ......................................................................................1

N.Y. Business Corp. Law § 912 ......................................................passim

17 C.F.R. § 240.13d-5(b)(1) ................................................................18, 23

Fed R. Civ. P. 12(b)(6) ....................................................................1, 3, 14

Fed. R. Civ. P. 12(f) ...............................................................................11

H.R. Rep. No. 85, 73d Cong.,
   1st Sess., 1-5 (1933) ..........................................................................16

2864418-1

## STATEMENT OF JURISDICTION

The claims in this appeal arise under Sections 13(d) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, et seq. (the "Exchange Act"), and the related rules and regulations promulgated thereunder by the United States Securities and Exchange Commission ("SEC"). The District Court had jurisdiction over this matter, pursuant to 28 U.S.C. § 1331, as it presents federal questions, and pursuant to the Exchange Act, 15 U.S.C. §§ 78aa, which confers on federal courts exclusive jurisdiction over "all suits in equity and actions at law" to enforce any liability or duty under the Exchange Act. (A 14.)[1]

In addition, the District Court had diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because Plaintiff-Appellant Forward Industries, Inc. is a New York corporation with its principal place of business in Florida, while Defendant-Appellee Terence Bernard Wise is a citizen and resident of the United Kingdom and Defendant-Appellee Jenny P. Yu is a citizen of Taiwan and resident of California. (A 14.)

On September 23, 2014, the Honorable Jed S. Rakoff issued a Memorandum and Order, dated September 20, 2014, granting with prejudice the motions of Defendants-Appellees to dismiss Plaintiff-Appellant's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), representing a final judgment. (SPA 2-

---

[1] References to "A __" are to the indicated page(s) of the parties' Joint Appendix.

10.)[2]  On September 25, 2014, Plaintiff-Appellant filed a Notice of Appeal.  (A 562.)

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, governing appeals from the final decisions of the District Courts, and this appeal must be taken to this Court pursuant to 28 U.S.C. § 1294(1).

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

This appeal presents a single issue for decision:  whether the District Court (Rakoff, D.J.) erred in holding that the Complaint fails to set forth sufficient factual matter, when accepted as true, to state a claim for relief that is plausible on its face.  The District Court erred by substituting its own inferences for those, in Plaintiff-Appellant's favor, that reasonably and plausibly arise from the Complaint.

## STANDARD OF REVIEW

This Court's standard of review over a motion to dismiss is well-established: "Our standard of review for both motions to dismiss and motions for summary judgment is *de novo*."  *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 225 (2d Cir. 2013).

## STATEMENT OF THE CASE

This matter comes before the Court on an expedited basis, pursuant to this Court's Local Rule 31.2 (b)(1)(A), as an appeal from the dismissal with prejudice

---

[2] References to "SPA __" are to the Special Appendix.

by the District Court (Rakoff, D.J.) of Plaintiff-Appellant's Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (SPA 2-10.)

Plaintiff-Appellant Forward Industries, Inc. ("Forward") brought this case against its shareholder and director, Defendant-Appellant Terence Bernard Wise ("Wise") and his long-time business associate, employee and fellow Forward investor, Defendant-Appellee Jenny P. Yu ("Yu"), for their false and misleading statements made to the SEC in violation of Sections 13(d) and 14(a) of the Exchange Act.

**THE ALLEGATIONS OF THE COMPLAINT**

**A.     The Parties.**

Plaintiff-Appellant Forward is a corporation organized under the laws of the State of New York, with its principal place of business in West Palm Beach, Florida. The Company began operations as a manufacturer and distributor of specialty and promotional products, and today designs, markets, and distributes, primarily for the benefit of hand held electronic devices, so-called "carry and protective solutions" such as soft-sided carrying cases, bags, protective plates and other accessories made of leather, plastic, and other synthetic materials. (A 14-15.)

Defendant-Appellee Terence Bernard Wise is a citizen and resident of London, England. He is the sole owner of Forward Industries Asia-Pacific Corporation ("Forward China"), a British Virgin Islands registered corporation that

3

is Forward's exclusive sourcing agent in the Asia-Pacific region. Wise is Forward's largest shareholder. In December 2011, he purchased an aggregate of 1,076,808 shares of Forward common stock in a private transaction, and since February 2012, Wise has been a director of Forward. In October 2012, Wise acquired an additional 506,733 shares (pursuant to a put option that was a feature of his December 2011 purchase), bringing his total share ownership at that time to 1,583,541 shares, or 19.66% of the then-outstanding common stock of the Company. (A 15-16.)

Defendant-Appellee Jenny P. Yu is a citizen of Taiwan who resides in California. Yu has been a business associate of Wise for many years and is, and has been at all relevant times herein, Managing Director of Wise's company, Forward China. (A 15.)

**B.      Wise and Yu Control Forward's Supply Chain.**

Forward's principal customer market is original equipment manufacturers, or "OEMs," that either package Forward's products as accessories "in box" together with their branded product offerings, or sell them through their retail distribution channels. Forward does not manufacture any of its OEM products and it sources substantially all of its OEM products from independent suppliers in China. (A 15.)

4

In March 2012, Forward entered into a Buying Agency and Supply Agreement with Forward China, owned by Wise and managed by Yu, pursuant to which Forward China would act as the Company's exclusive buying agent and supplier of products in the Asia-Pacific Region. Forward anticipates that substantially all of its purchases will be made directly from Forward China by the end of 2014. (A 16.)

### C. Wise Nominates Yu to Forward's Board and Yu Attends Board Meetings.

In 2012, Wise proposed that Yu be permitted to join Forward's Board. Forward did not agree to Wise's request, but, in light of her significant role within Forward China as its Managing Director, Forward acquiesced to Wise's request that Yu be permitted to attend Board meetings. Yu attended Board meetings on February 8, 2012, May 8, 2012, and February 8, 2013, and participated in a telephonic Board meeting on February 28, 2012. (A 16-17.)

### D. Wise's Acquisition of Twenty Percent of Forward's Outstanding Securities Triggers New York's Anti-Takeover Statute.

Wise filed a Schedule 13D with the SEC in December 2011, upon his initial acquisition of Forward common stock (the "Wise Initial 13D"), and filed Amendment No. 1 to the Wise Initial 13D in October 2012, upon his acquisition of the additional shares via his counterparty's exercise of the put option in Wise's initial acquisition agreement. Accordingly, as of October 2012, Wise's 1,583,541

5

shares, plus an immediately exercisable option to purchase an additional 10,000 shares, represented 19.66% of the then-outstanding common stock of the Company.  (A 16, 18-19.)

The exercise of the put option placed Wise at the threshold of Business Corporation Law ("BCL") Section 912, New York's statutory "poison pill," which generally prohibits an "interested shareholder" who acquires 20% or more of the voting stock of a New York corporation from effecting a "business combination" with that corporation for five years following the acquisition, unless the bidder has obtained prior board approval.  An "interested shareholder" is defined in BCL Section 912(a)(10), in relevant part, as any person who is "the beneficial owner, directly or indirectly, of twenty percent or more of the outstanding voting stock of such corporation."  In turn, a "beneficial owner," is defined in Section 912(a)(4) to include a person who "has any agreement, arrangement or understanding (whether or not in writing), for the purpose of acquiring, holding, voting . . . or disposing of such stock with any other person that beneficially owns, or whose affiliates or associates beneficially own, directly or indirectly, such stock."  (A 12, 16, 18-19, 28-29.)

**E.    Yu Begins to Acquire Forward Shares After Wise Reaches New York's Anti-Takeover Statutory Threshold.**

As of October 2012, Wise was unable to acquire additional shares without activating New York's anti-takeover statute.  (A 19, 28-29.)  It is apparent that Wise then turned to Yu to assist him in acquiring a controlling block of Forward shares, as Yu's purchases of Forward's securities began shortly thereafter.  On April 19, 2013, Yu filed a Schedule 13D with the SEC, indicating that she was the beneficial owner of 444,217 shares of Forward common stock, representing 5.48% of the then outstanding common stock of the Company.  (A 19-20.)  Contrary to the rules governing Schedule 13D, Yu concealed the timing and quantity of the purchases made by her within the prior 60 days.  After Company counsel notified her of this deficiency, Yu filed an Amended Schedule 13D, setting forth the details of her acquisition of 338,748 shares of Forward common stock (or about 75% of her total) in multiple trades between February 19, 2013 and April 15, 2013, not long after Wise's acquisition of 19.66% of the Company, in October 2012.  (A 20-21.)

**F.    Wise's and Yu's Understanding Regarding Their Forward Investment.**

As alleged in the Complaint, Wise and Yu have had an express, or at least an implied, understanding with respect to how they would handle the voting, holding and disposition of their Forward shares, and are attempting to take control of

7

Forward without disclosing either their association or their plans for the Company. (A 11-14, 19-25, 27-29.) The inference that Wise and Yu are working in tandem is a powerful one that flows straight from the allegations in the Complaint.

For one, they are long-term business partners who have partnered in many ventures for many years in various capacities, including in several pooled investments. (A 15,17.) Indeed, in connection with preliminary injunction proceedings below, Wise and Yu placed sworn testimony before the Court concerning their two decades of professional and personal collaboration that amplified this allegation, including the following:

- Their relationship began at the latest in 1995 when Wise and Yu's family were co-owners of The Justwise Group, Ltd., a company founded by Wise and for which Yu served as a director for almost a decade. (A 235-36, 339-41.) Wise sold his interest in Justwise to the Yu family in 2003 and then subsequently purchased the company back from them in 2011. Yu and members of the Yu family continue to source and sell products to Justwise. (A 340.)

- Wise and the Yu family also were partners in Eurofresh Ltd. between 2000 and 2009, and although Wise sold his interest in that company to the Yu family, he remains a director. (A 236, 341.)

- In 2011, Wise formed what became Forward China and retained Ms. Yu as Managing Director. (A 340-41.)

8

- Wise continues to provide consultancy services to the Yu family through Wise's company Doheny Ltd. (A 236, 341.) Additionally, "Doheny" is the name of the street on which Yu's California residence is located. (A 214.)

Yu is currently Wise's employee, as Managing Director of Wise's wholly-owned company, Forward China, which is also Forward's primary supplier. Wise has recommended Yu to serve on the Board and, failing that, invited Yu to attend Board meetings with him, which she has done.

Finally, only *after* Wise approached the Section 912 threshold did Yu begin to build her 5.48% position in Forward. (A 11-14, 16, 18-20.) When combined with Wise's 19.66%, the two maintain a controlling block of just over 25% of the Company.

### G. Wise Moves to Take Over Forward Without Disclosing the Wise-Yu Group.

On June 6, 2014, Wise initiated a proxy contest against the Company, *via* a letter to the Board (the "First Nomination") that declared his intention to file proxy materials to solicit votes for the election of himself and three others as directors on the seven-member Forward Board. On June 26, 2014, Wise announced that he would in fact nominate a full slate of seven directors (the "Second Nomination"). If elected, Wise's hand-picked slate would take control of the Board and the Company. As alleged in the Complaint, both the First and Second Nominations

9

failed to disclose the existence of a Wise-Yu group within the meaning of the securities laws, arising from their understandings with respect to the securities of the Company. Similarly, the Complaint alleges that Wise and Yu each have failed to amend their filings on Schedule 13D to disclose their membership in the Wise-Yu group and describe their plans for Forward. (A 21-24.)

### THE PROCEEDINGS BELOW

On July 16, 2014, Forward filed a Verified Complaint against Wise and Yu in the United States District Court for the Southern District of New York, seeking preliminary and permanent equitable relief, including corrective disclosures, against on-going and future violations of the securities laws. (A 1.) Specifically, the Complaint alleges violations of Section 13(a) of the Exchange Act by Wise and Yu, based on the failures of the respective Schedules 13D filed by Wise and Yu to make the required full and fair disclosure and for concealing Wise's and Yu's common understanding and agreement regarding their investments in Forward's securities and their joint plan to take control of the Company. The Complaint additionally alleges that the Schedules 13D are further deficient by failing to disclose the accurate total of aggregate Forward shares Wise and Yu beneficially own, by each having neglected to include the shares of the other on their respective Schedules 13D. (A 23-24.)

The Complaint also alleges violations of Section 14(a) by Wise, based on his dissemination of false and misleading proxy materials that failed accurately to disclose Yu's identity as a participant in the solicitation, her holdings of Forward securities, their understandings and agreements concerning their Forward investment, and the inclusion of Yu's shares in his total of aggregate shares beneficially owned. (A 24-25.)

Finally, the Complaint seeks a declaratory judgment against Wise proclaiming his nominations invalid under the Company's Bylaws for failure to accurately disclose his membership in the Wise-Yu group and his beneficial ownership of Forward's securities, and a declaratory judgment against Wise and Yu finding that they are "interested shareholders" within the meaning of Section 912 and therefore subject to its prohibitions on "business combinations" with Forward and Forward China. (A 26-29.)

The case was assigned to the Honorable Jed S. Rakoff. (A 1.) After denying Forward's motions for a temporary restraining order and preliminary injunction, and partially granting Yu's motion to strike certain portions of the Complaint pursuant to Rule 12(f) of the Federal Rules of Civil Procedure (A 514-15; SPA 38-39), the District Court took briefing and heard argument on Wise's and Yu's motions to dismiss.

The Court then granted the motions to dismiss on September 23, 2014, holding that Forward's allegations concerning the Wise-Yu group—including their long-standing relationship and past joint ventures, Yu's present employment by Wise at Forward China, Yu's attendance at Board meetings, and the timing of Yu's purchases coming on the heels of Wise's reaching the BCL Section 912 threshold—were all insufficient to draw an inference that they had a current agreement with regard to Forward securities. (SPA 7-9.) The Court found that Yu's employment by Wise did not support the inference that he could "direct her personal investment decisions," and also concluded that there was nothing "particularly suspicious" about Wise's suggestion that Yu attend Board meetings in light of Yu's position as Managing Director at Forward China. (SPA 8.) The District Court discounted Forward's allegation that Wise's acquisition of nearly 20% of Forward's outstanding shares—and the resulting restrictions on his ability to acquire more Forward shares imposed by New York's anti-takeover statutory provisions—was a factor in Yu's subsequent decision to invest in the Company or provided the basis for an inference that there was an agreement or understanding between Wise and Yu with respect to Forward securities. (SPA 8-9.) The District Court then determined that, because Forward's other allegations depended on the existence of a reportable group, all of Forward's claims for relief should be dismissed, and that the dismissal should be with prejudice because Forward did not

12

propose amendments to the Complaint in its opposition to the motions.  (SPA 9-10.)

## SUMMARY OF ARGUMENT

Forward respectfully submits that the District Court erred in dismissing the Complaint.  Although the Court paid lip service to its proper standard of review, it failed to draw the reasonable inferences from Forward's allegations to which Forward was entitled at this stage of the proceedings, and instead relied upon its own (less plausible and flawed) inferences.

The well-pled allegations set forth in the Complaint reveal that, as of October 2012, Wise held approximately 19.66% of Forward's outstanding common stock and was thus blocked from acquiring any more shares by New York's statutory "poison pill," BCL Section 912, which imposes harsh restrictions on those acquiring in excess of 20% of a public company's shares.  In an effort to acquire a control block of Forward stock, Wise turned to his close business associate, Yu, who in the ensuing months rapidly acquired approximately 5.5% of Forward's shares, allowing Wise to control a total of approximately 25% of Forward's shares.

Wise's claim that Yu is independent of his control scheme is simply not plausible.  Yu is an employee of Wise's wholly-owned company and has served as his business partner in multiple enterprises for many years.  Remarkably, Ms. Yu's

13

initial Schedule 13D was misleading on its face—for failure to disclose her purchases within the preceding 60 days. After Forward demanded full disclosure, it soon learned the rationale for her concealment: the vast majority, and perhaps all, of Yu's purchases came *after* Wise's bid to acquire a control block was halted by BCL Section 912. Wise, no doubt supported by Yu, is now pursuing a proxy campaign to take control of Forward's Board. Nonetheless, and contrary to law, his Schedule 13D and 14A filings with the SEC fail to disclose any arrangements or understandings with his employee and business partner, Yu, concerning their Forward shares.

The District Court dismissed Forward's Complaint for failure to state a claim, holding that the allegations of coordinated share purchases, acts of concealment, joint financial ties involving Forward, and history of joint business dealings could not support an inference that Wise and Yu constituted a "group" under Section 13(d) of the Exchange Act. This holding was inappropriate.

Accordingly, the District Court's Memorandum and Order should be reversed.

## ARGUMENT

In reviewing a dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, this Court will "'constru[e] the complaint liberally, accept[ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in

14

the plaintiff's favor.'" *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002)). "'Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief.'" *Id.* (quoting *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (dismissal appropriate where facts alleged do not permit inference of more than "mere possibility" of wrongdoing).

Here, the District Court erred in its failure to draw reasonable inferences of an agreement from the allegations in Forward's Complaint. The allegations of the complaint permit the reasonable inference that Wise and Yu had formed a Section 13(d) group, and the District Court disregarded clear precedent set by this Court and other district courts in this judicial Circuit in failing to draw those reasonable inferences.

## THE DISTRICT COURT ERRED IN DISMISSING THE COMPLAINT FOR FAILURE ADEQUATELY TO ALLEGE A GROUP UNDER SECTION 13(d)

### A. Section 13(d) Is to Be Broadly Construed.

Full disclosure to the investing public is at the heart of both the Securities Act of 1933 and the Exchange Act. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) (Securities Act "was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to

15

protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." (citing H.R. Rep. No. 85, 73d Cong., 1st Sess., 1-5 (1933)); *Bank of Am. Nat'l Trust Sav. Ass'n v. Douglas*, 105 F.2d 100, 103 (D.C. Cir. 1939) (Exchange Act enacted "for the protection of investors" to impose liability for false and misleading statements and is intended to "require complete and truthful exposure of all matters in relation to [a] registrant's financial condition").

Similarly, Section 13(d) and the Williams Act generally amended the Exchange Act with "a single-minded concern [of] protecting investors." *Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 900 (D. Del. 1991); *see also Wellman v. Dickinson*, 475 F. Supp. 783, 825 (S.D.N.Y. 1979), *aff'd* 682 F.2d 355 (2d Cir. 1982) ("a principal objective of the Williams Act [is] to prevent secret corporate takeovers"). Congress intended the Williams Act "to be construed . . . not technically and restrictively, but flexibly to effectuate its remedial purposes." *S.E.C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963) (federal securities laws must be given a construction which effectuates their remedial objectives). The language of the section and its legislative history confirm that the statute was first and foremost a reporting provision concerned with providing full disclosure by requiring reporting on the part of those persons or groups of persons who have acquired a substantial amount of stock. *SEC v. Savoy Indus., Inc.*, 587

16

F.2d 1149, 1167 (D.C. Cir. 1978). As a prophylactic rule, "'[t]he purpose of Section 13(d) is to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control.'" *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 122-23 (2d Cir. 2001) (quoting *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971)).

As this Court has explained, allegations of group activity under Section 13(d) rarely involve "smoking guns" or admissions of agreements. *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 617 (2d Cir. 2002). Rather, the existence of a group within the meaning of Section 13(d)(3) is usually determined by the weight of circumstantial evidence supporting "the inference of a formal or informal understanding . . . for the purpose of acquiring, holding, or disposing of securities." *Id.*; *see also Savoy Indus., Inc.*, 587 F.2d at 1162 (circumstantial evidence supporting the inference of a formal or informal understanding between defendants for the purpose of acquiring, holding, or disposing of securities is sufficient to establish the existence of a group). The District Court disregarded that guidance in evaluating the allegations in Forward's Complaint, and failed to afford Forward the reasonable and appropriate inferences supporting the formation of a group by Wise and Yu.

17

**B.**     **The Hallmark of a Section 13(d) Group Is a Combination with a Common Objective.**

Section 13(d)(3) provides that a stockholder group is formed "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer."  15 U.S.C. § 78m(d)(3).  Rule 13d-5(b)(1) states:

> When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.

17 C.F.R. §240.13d-5(b)(1); *see also Roth v. Jennings*, 489 F.3d 499, 507-08 (2d Cir. 2007) ("if two or more entities agree to act together for any of the listed purposes, a 'group' is 'thereby' formed").

As this Court has explained, the "touchstone" of a Section 13(d) group is that "the members combined in furtherance of a common objective."  *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982), *cert. denied* 460 U.S. 1069 (1983). The legal standard for a 13(d) agreement is broad.  Such an agreement may be "formal or informal."  *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 283 (2d Cir. 2011); *see also Hallwood Realty Partners*, 286 F.3d at 617 (citing "formal or informal understanding").  "Of course, the concerted action of the group's members need not be expressly memorialized in writing."  *Wellman*,

682 F.2d at 363; *see also Roth*, 489 F.3d at 508 (2d Cir. 2007) (evidence that group members "might not always make identical investment decisions" does "not preclude existence of agreement") (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 124 (2d Cir. 2001)).  Indeed, a group need not even "be committed to acquisition, holding, or disposition [of securities] on any specific set of terms." *Morales v. Freund*, 163 F.3d 763, 767 &n.5 (2d Cir. 1999).

> **C.  The Complaint Adequately Alleges a Reportable Wise-Yu Group.**

The allegations of the Complaint readily support the reasonable inference that Wise and Yu have formed a combination with a common objective regarding their Forward investment.  Wise and Yu are admitted long-time collaborators in many business ventures and partnerships through the years (A 15, 17-20, 23-24, 235-37, 339-341), and they currently are the respective owner and Managing Director of Forward's sole supplier, Forward China (A 15).  Wise initially sought to place Yu on Forward's Board as his designee, and Yu attended several Company Board meeting at his request.  (A 16-17.)  Wise and Yu are among Forward's largest shareholders, and have built their positions in the Company at considerable expense.  (A 18-21; 57-146; 211-26.)  Wise is now engaged in a proxy contest to replace Forward's entire Board with his designees.  (A 21, 147-209.)  The logical and plausible inference from these allegations is that the

19

principal and the Managing Director of Forward's sole supplier—who already are combined and working together through Forward China with regard to Forward— also have a common objective with regard to their Forward investment, and an understanding as to how they will hold, dispose of and vote their shares in Wise's proxy contest. Indeed, the *implausible* inference in these circumstances is the one that Defendants-Appellants have asserted and the District Court has embraced: that—despite their long-standing business partnership and co-investment history, their current Forward-related collaboration in Forward China, their positions as among Forward's largest shareholders, their shared knowledge of the Company's business, and the apparently coordinated timing of Yu's acquisition of Forward stock—Wise and Yu do *not* have a common understanding regarding their Forward investments and Wise's on-going proxy contest to take control of Forward.

This Court has inferred the existence of a reportable group in similar circumstances. For example, in *GAF Corporation v. Milstein*, the Court reversed the dismissal of a complaint under Rule 12(b)(6) in which plaintiff GAF Corporation alleged that the defendants, four members of the Milstein family, initially had failed to file a Schedule 13D, and then filed a Schedule allegedly containing false statements concerning their conspiracy and common purpose to take control of GAF. 453 F.2d 709, 712-13 (2d Cir. 1971). In that case, the Milsteins received approximately 10.25% of GAF's outstanding preferred shares

20

when their former company was merged into GAF, and sought board and senior management positions for one of their group, which the company rejected. *Id*. at 713-14. Like Wise here,[3] the Milsteins then disparaged the company's management and sued the company derivatively. *Id.* The company contended that the Milsteins had violated Section 13(d), *id*. at 714, and, like Wise here, the Milsteins then initiated a proxy contest for board control. *Id*. On these allegations, the Court determined that it "could not conclude other than" that the Milsteins were a group for the purposes of Section 13(d). *Id*. The allegations supporting this Court's decision in *GAF Corporation* are present in Forward's complaint: a close relationship between the shareholders (here, an admitted 20 year history of working together rather than family ties) (A 235-37, 339-41), rejection by the defendant company of the shareholders' request for a Board position (*id*. 16-17), and subsequent disparagement of the company's management and the initiation of lawsuits and proxy contests (*id*. 21, 147-209). The District Court erred in failing to give the appropriate consideration to these factors in concluding that no group had been formed between Wise and Yu.

Similarly, in *Morales v. Quintel Entertainment, Inc.*, this Court vacated the district court's granting of summary judgment to a shareholder defendant on the

---

[3] Wise separately has sued Forward and five of its directors in a purported derivative action filed in New York State Court. (A 443-460.)

grounds that a trier of fact could reasonably find that coordinated activities between such shareholder, and two others, could render such shareholder the beneficial owner of the shares of the other two. 249 F.3d 115 (2d Cir. 2001). In *Quintel*, three shareholders, including defendant Peter Stolz, acquired shares in plaintiff Quintel Entertainment in a transaction in which Stolz and the two other shareholders sold to Quintel their interests in a privately held LLC in exchange for Quintel common stock. Under the sales agreement, Stolz obtained 325,000 (or less than 2.5% of the total outstanding) shares of Quintel. However, when combined with the shares of the two other shareholders, that amount increased to over 18% of Quintel's shares. *Id.* at 119-20.

The three shareholders subsequently filed a Schedule 13D reporting their acquisition of Quintel stock pursuant to the sales agreement, stating that a Section 13(d) group "'may be formed which may be deemed to be the beneficial owner'' of the 18% of Quintel shares they aggregately owned, but disclaiming any beneficial ownership by each individual shareholder of the other's stock. *Quintel Entm't, Inc.*, 249 F.3d at 120. Over the next two years, after Stolz bought and sold Quintel shares in a series of transactions, a Quintel shareholder brought a derivative suit pursuant to Section 16(b) of the Exchange Act, seeking to recover Stolz's profits from short-swing trading. After limited discovery, the district court denied plaintiff's motion for summary judgment and determined that, since Stolz

22

individually owned less than 2.5% of Quintel shares and disclaimed beneficial ownership of the shares of the other two shareholders, he did not meet the 10% threshold required to invoke Section 16(b). *Id*. at 121.

In reversing, this Court disagreed with the district court's conclusion that there was no evidence of the three shareholders' agreement to seek corporate control over Quintel, writing: "we agree with the SEC that the agreement required by Section 13(d)(3) need not be an agreement to gain corporate control or to influence corporate affairs." *Id*. at 124. Instead, this Court underscored that "the plain language" of Section 13(d) (as well as 17 C.F.R. § 240.13d-5(b)(1)) requires "only an agreement 'for the purpose of acquiring, holding or disposing of securities.'" *Id*. at 124-25 (quoting 15 U.S.C. § 78m(d)(3)). In concluding that a rational trier of fact could find an agreement between the shareholders to act together in their acquisition of Quintel shares, this Court considered the three shareholders' status as members of a closely-held corporation with no shareholders other than each other, their execution of lock-up provisions in the sales agreement, and the entrance of Quintel into an employment agreement with one of shareholders. *Id*. at 125. Based on these facts, this Court concluded that more than a "mere business relationship" had been alleged as the basis for group membership, and that a reasonable trier of fact could discredit the shareholders' sworn statements denying coordination. *Id*. at 126.

23

Like the plaintiff in *Quintel,* Forward has alleged more than a "mere" business relationship between Wise and Yu.  In addition to their extensive history as business partners and collaborators (A 15, 17-20, 23-24, 235-37, 339-341), Wise and Yu are the principal and Managing Director in Wise's wholly-owned Company, which is Forward's sole supplier (*id*. 15-16).  Wise sought Yu's election to Forward's Board, and failing that, had her attend the Board meetings.  (A 17.) The District Court erroneously failed to draw from those facts the reasonable and powerful inferences pointing to a common agreement with respect to Forward shares.  Wise and Yu regularly coordinate regarding Forward's business in connection with their work with Forward China.  Given their past history of investing together, it is unreasonable to conclude that they had no similar agreements or understandings with regard to their Forward shares, and the District Court erred in holding that Forward had not alleged enough facts to support the existence of a Section 13(d) group between Wise and Yu.

The district courts within this Circuit likewise have readily inferred or found the existence of reportable groups from similar allegations.  For example, in *Strauss v. American Holdings, Inc.*, the district court found that plaintiff had adequately stated a Section 13(d) claim where the complaint alleged that the president and chief executive officer of the defendant, AmHold, also was the sole general partner of a separate entity, Shamrock, and that both AmHold and

Shamrock traded in the securities of the plaintiff, Servico. 902 F. Supp. 475, 479-480 (S.D.N.Y. 1995) (Kaplan, J.). The district court drew the inference that Amhold, through its president and CEO, formed an agreement with Shamrock, through its general partner, to act together with respect to Servico's shares. *Id.* Here, Wise and Yu are connected both by their years of joint investing experience and through their work together as principal and manager, respectively, of Forward China, Forward's supplier. It is reasonable to infer under these circumstances that Wise and Yu have a similar agreement concerning their Forward investment.

Moreover, as alleged in the Complaint, Wise and Yu had a clear motive to conceal the formation of their group. Wise, having acquired nearly the maximum number of shares possible without triggering Section 912 of the New York Business Corporation Law, could not himself purchase additional shares of the Company without consequence. The application of Section 912 to Wise would foreclose any "business combinations" and other transactions between Wise or Forward-China, Wise's wholly-owned company, and Forward, for five years absent Board approval. Yu's rapid purchases of Forward's shares took place *after* Wise reached Section 912's threshold (A 16, 18-21, 211-26), and the reasonable and plausible inference from this allegation is that Wise and Yu were aware of the threshold, and agreed that Yu would build a position in Forward that she and Wise would control.

25

**D.** **The District Court's Opinion Is Based on Flawed Logic and Inapposite Authority.**

The District Court improperly and illogically rejected the powerful inferences set forth in the Complaint.

First, the District Court erroneously considered the Defendants' long-time relationship in isolation, and relied upon *Transcon Lines v. A.G. Becker Inc.* for the unremarkable proposition that "[m]ere relationship, among persons or entities, whether family, personal or business, is insufficient" to create a group under Section 13(d). (SPA 7 (citing *Transcon Lines v. A.G. Becker Inc.*, 470 F. Supp. 356, 375 (S.D.N.Y. 1979)).) *Transcon* is inapposite to Forward's allegations. In that case, the district court determined that there could no reportable Section 13(d) group because one of alleged members did not even own any of the plaintiff's shares. *Id.* at 374-375. Here, moreover, Forward's allegations are far more specific than those in *Transcon*. Forward is not alleging a group solely based on Wise's and Yu's long-standing personal and professional association; Forward also has alleged that both Wise and Yu are current Forward shareholders who have engaged in coordinated trading and are presently working together in a business that is intertwined with Forward's business, and further, have been closely involved with Forward's corporate governance. (A 15-20.) The reasonable inference from such allegations, which the District Court failed to make, is that

26

Wise and Yu have an agreement covering their Forward business together, including their Forward investment.

Similarly, the District Court mistakenly relied on *Log On America, Inc. v. Promethean Asset Management LLC* (SPA 7-8) to discount Forward's allegations concerning Wise's and Yu's past joint investments. 223 F. Supp. 2d 435 (S.D.N.Y. 2001). In that case, the parties each were large institutional investors, venture capital funds or hedge funds, and the district court gave the evidence of past joint investment less weight where the plaintiff did not specify how the defendants acted together in connection with the investment at issue. *Id*. at 449. By contrast, Forward has alleged how Wise and Yu—individual investors—have acted in concert and intended to act together in the future with respect to Wise's proxy contest and the upcoming shareholder vote. (A 15-20, 23-24.) The reasonable inference from Forward's allegations is that Wise and Yu have an agreement regarding the voting of their Forward shares.[4]

---

[4] The District Court's reliance on *meVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*, 260 F. Supp. 2d 616, 633 (S.D.N.Y. 2003) in support of its discussion of the sufficiency of Section 13(d) complaints and allegations is also unavailing. (SPA 7.) In that case, the plaintiff offered "sporadic email communication," the inclusion of one defendant in the other's proxy materials, and coordinated trading as evidence supporting the inference of group formation. The district court deemed such evidence as insufficient, noting that the emails (of which there were only 6) and the proxy materials did not reveal any agreement or understanding, and that the trading evidence offered did not demonstrate any significant accumulation of plaintiff's shares. 260 F. Supp. 2d at 632-33. Importantly, in *meVC* the court was evaluating a preliminary injunction motion

27

Next, the District Court also misinterpreted the significance of Yu's status as Wise's employee at Forward China. The relevant inquiry for the purposes of Section 13(d) is not, as the District Court stated, whether Wise can "direct [Yu's] personal investment decisions." (SPA 8.) Forward is not required to allege that Wise *directed* Yu's investment decisions for the purposes of stating a claim that a Section 13(d) group prevails between them. *See Morales v. Freund*, 163 F.3d at 767 n.5 (alleged group members "need not be committed to acquiring, holding, voting or disposing of equity securities on specified terms"). Rather, allegations of coordinated trading, as set out in the Complaint, are sufficient, together with Forward's other allegations, to form the basis of a reasonable inference, which the District Court unreasonably failed to make, that a Wise-Yu group exists. The question is whether the members "combined in furtherance of a common objective." *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982). The credible evidence here—including Wise's and Yu's long-standing association and past partnerships and investments, their current work together with respect to Forward and Forward China, their participation in Forward's corporate governance, and the timing of Yu's purchases of Forward's shares (A 15-20)—and the plausible

---

rather a motion to dismiss, and the parties had conducted expedited discovery, which was denied here. *Id.* at 618.

inferences drawn from such evidence, suggest that Wise and Yu in fact combined together for a common objective.

The District Court's conclusion that there was nothing "suspicious" about Wise's suggestion that Yu attend Forward Board meetings is similarly off the mark. (SPA 8.) The District Court accepted at face value Wise's proffered basis for Yu's attendance at the meetings, which was also accepted by Forward at the time—*i.e.*, Yu's significant role in Forward China and the then-imminent sourcing agreement between her company and Forward. In hindsight, however, Wise's invitation for Yu to attend Board meetings may fairly be read as an effort by Wise to enable Yu to become comfortable with her forthcoming investment in Forward. Moreover, Wise only accepted Yu's Board attendance as an observer after Forward declined Wise's request to make Yu an actual Board member. (A 17.)

Finally, the District Court improperly discounted the significance of BCL Section 912 on Wise's 19.66% holding in Forward. As noted above, Wise (and likely Forward China, as an entity wholly owned by Wise), would be constrained from entering into any business combinations with Forward, were Wise to cross the 20% threshold and be deemed an interested shareholder pursuant to the statute's terms. Accordingly, the Complaint alleges that, blocked by Section 912 from acquiring more Forward shares, Wise turned to his longtime business

associate and present employee for assistance in accumulating a controlling block of shares.  The District Court held that this argument had "two obvious flaws."

First, the Court wrote: "Wise's holdings approached the 20% threshold in October 2012 because the company[5] exercised its put option, not because Wise actively sought to purchase a larger stake.  The contingent nature of his purchase weakens any inference that could be drawn from its size or timing."  (SPA 9.)  The District Court's reasoning is itself flawed in several respects and factually incorrect.  For one, the District Court erred in placing unwarranted significance upon the sellers' exercise of its put option.  The put option was a bargained-for feature of Wise's purchase agreement (A 16, 57-92), and therefore both the size and timing of the put were entirely *foreseeable* to Wise upon his initial acquisition of Forward's shares.  As Wise explained in his Schedule 13D, his purchase agreement consisted of both a put option and a call option, with the former being in favor of the sellers and the latter running in favor of Wise.  (A 62-66.)  Both the quantity of shares that Wise could be required to purchase, pursuant to the put, and the window of timing for its exercise were agreed to by Wise at the time of his initial investment.  Thus, contrary to the District Court's reasoning, Wise's acquisition of the shares that brought him to approach Section 912's threshold,

---

[5] The Complaint does not allege that it was, and in fact it was not, the Company who was the counterparty to Wise's trade.  (A 16, 96-97.)

through exercise of the put option, was not truly involuntary or unforeseen to Wise. In any event, the District Court misapprehended the relevance of Wise's acquisition of the shares: after Wise became the holder of 19.66% of Forward's outstanding common shares, regardless of *how* that happened, he was subject to the provisions of BCL Section 912 that would deem him an interested shareholder and constrain his ability to enter into business combinations with Forward, including transactions involving Forward China.

Second, the District Court improperly discounted the effect of Section 912, contending that it has "no bearing at all" on Wise's conduct because the provision has nothing to do with the nomination of directors, but instead "restricts transactions that Wise is not alleged to have entered or even been planning." (SPA 9.) The District Court plainly misunderstood that the significance for Wise of meeting the Section 912 threshold does not attach to his ability to conduct a proxy contest, but rather relates to the strict limitations on the transactions that Wise could enter into with Forward. (A 28-29.) If applicable to Wise, Section 912 on its face would severely constrict his business options with respect to his investment in Forward. The sheer *in terrorem* effect of Section 912 unquestionably restricts Wise and is a circumstance that the District Court was wrong to discount. *See, e.g., Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 175-76 (S.D.N.Y. 2000) (finding that existence of poison pill provided motive for

31

defendant shareholders to hide group status and enlist "covert allies" in efforts to take control of company).

Indeed, contrary to the District Court's decision below, courts have recognized that the motivation to conceal the formation and purpose of a Section 13(d) group can be found where acquisitive shareholders are confronted with anti-takeover measures.  For example, in *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, the district court found that the plaintiff, a publicly-traded REIT, stated a Williams Act claim against its largest shareholder for nondisclosure of a group formed to acquire the REIT, liquidate it and distribute its assets.  95 F. Supp. 2d at 177.  The court determined that the shareholder had a motive to hide its group member status because the REIT had a shareholders' rights plan designed to stave off hostile takeover bids.  The plan provided that shareholders would be entitled to half-price purchases of additional shares if any person or Section 13(d) group became the beneficial owner of 15% or more of the REIT's shares.  The court concluded that defendant "could avoid triggering the poison pill while at the same time amassing substantial influence or control over the company" if it also could "enlist covert allies in its alleged goal of taking over" and liquidating the REIT.  *Id.* at 175-76.

The court further determined that plaintiff's allegations that the defendants' principals had "long-standing personal relationships" and had been "actively

involved in previous investments" provided "substantial support" for the inference that the defendants were acting together with respect to the REIT. *Id*. at 176. As the court explained:

> Indeed, it is well to bear in mind that the allegation that defendants are acting as a group is analogous to a charge of conspiracy—both assert that two or more persons reached an understanding, explicit or tacit, to act in concert to achieve a common goal—and that defendants in criminal cases regularly are convicted of conspiracy beyond a reasonable doubt on less direct evidence of agreement than plaintiff here alleges. While plaintiff ultimately may fail to persuade the trier to infer that defendants are acting as a group, it is entitled to try.

*Id*. Like the plaintiff in *Hallwood Realty Partners*, Forward has distinctly alleged "means, motive and opportunity." *Id*. Here, the District Court erred by failing to credit Forward's well-pled allegations regarding Wise's and Yu's understanding regarding their Forward shares, and by failing to draw from those allegations the appropriate inferences as to the formation and existence of an undisclosed group.

33

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed in its entirety.

Dated:  New York, New York
        November 5, 2014

                                OLSHAN FROME WOLOSKY LLP

                                By   /s/ *Jeffrey A. Udell*
                                     Jeffrey A. Udell
                                     Ellen V. Holloman
                                     *Attorneys for Plaintiff-Appellant*
                                     *Forward Industries, Inc.*
                                     Park Avenue Tower
                                     65 East 55th Street
                                     New York, New York 10022
                                     (212) 451-2300

2864418-1

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

The foregoing memorandum of law complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 7,324 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

The foregoing memorandum of law complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word-Office 2007 in size 14 of the Times New Roman font.

/s/ *Ellen V. Holloman*

Ellen V. Holloman
OLSHAN FROME WOLOSKY LLP
*Attorneys for Plaintiff-Appellant*
*Forward Industries, Inc.*
Dated November 5, 2014

35

# SPECIAL APPENDIX

i

# Special Appendix Table of Contents

**Page**

Judgment of the United States District Court for the Southern
District of New York, Dated September 24, 2014,
Appealed From ....................................................................... SPA-1

Memorandum and Order of the Honorable Jed S. Rakoff,
Dated September 20, 2014 ..................................................... SPA-2

Transcript of Oral Argument on Defendants' Motions
to Dismiss Held before the Honorable Jed S. Rakoff,
Dated September 16, 2014 ..................................................... SPA-11

Order of the Honorable Jed S. Rakoff,
Dated August 19, 2014............................................................ SPA-38

Transcript of Oral Argument on Plaintiff's Motion for a
Preliminary Injunction Held before the Honorable
Jed S. Rakoff, Dated August 18, 2014 ................................... SPA-40

SPA-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
Forward Industries , Inc.,

                                    Plaintiff,

                    -against-

Terence Bernard Wise and Jenny p. Yu,
                                    Defendants.
---------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED 09/24/2014

**14 CIVIL 5365 (JSR)**

**JUDGMENT**

        Defendants having moved to dismiss (Doc. #35) pursuant to Fed. R. Civ. P. 12(b)(6), and

the matter having come before the Honorable Jed S. Rakoff, United States District Judge, and the

Court, on September 20, 2014, having rendered its Memorandum Order (Doc. #43) granting with

prejudice,  Defendants' motion to dismiss for failure to state a claim and directing the Clerk of Court

to enter judgment dismissing the case, it is,

        **ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in the

Court's Memorandum Order dated September 20, 2014, Defendants' motion to dismiss for failure

to state a claim is granted with prejudice; accordingly, the case is closed.

**Dated:**  New York, New York
             September 24, 2014

                                    **RUBY J. KRAJICK**
                                    _____
                                    **Clerk of Court**
                    **BY:**       K. Mango
                                    _____
                                    **Deputy Clerk**

**SPA-2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
FORWARD INDUSTRIES, INC.,              :
                                       :          14-cv-5365 (JSR)
        Plaintiff,                     :
                                       :          MEMORANDUM ORDER
        -v-                            :
                                       :
TERENCE BERNARD WISE and               :
JENNY P. YU,                           :
                                       :
        Defendants.                    :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

    This case arises from a rancorous struggle for control of

Forward Industries, Inc. ("Forward"), a New York corporation that

designs, markets, and distributes cases and other accessories for

handheld electronic devices. See Complaint dated July 16, 2014

("Compl.") ¶ 13. On June 6, 2014, Forward's director and largest

shareholder, defendant Terence Wise, launched a proxy battle to

replace members of Forward's Board of Directors. Id. ¶ 38. On July

16, 2014, Forward sued Wise and another Forward shareholder, co-

defendant Jenny Yu, alleging that they have concocted a joint scheme

to take control of the company that was not properly disclosed as

required by the federal securities laws. Id. ¶ 1. Currently before

the Court are defendants' motions to dismiss the entire Complaint

for failure to state a claim, see Fed. R. Civ. P. 12(b)(6), and,

additionally, their motions to dismiss count IV as insufficiently

"ripe" to qualify for declaratory judgment treatment.

1

SPA-3

According to the Complaint, defendant Wise is the sole owner of Forward Industries Asia-Pacific Corporation ("Forward China"), which has, since March 2012, been Forward's exclusive sourcing agent in the Asia-Pacific region. Compl. ¶¶ 14, 17. In December 2011, Wise purchased some 1.1 million shares of Forward common stock in a private transaction, which he disclosed on a Schedule 13D filed with the Securities and Exchange Commission ("SEC"). Id. ¶¶ 20, 30. He became a director of the company in February 2012. Id. ¶ 21. In October 2012, Forward exercised a put option that was a feature of the December 2011 transaction and that required Wise to purchase an additional 500,000-odd shares, bringing his total ownership to 19.66% of the company's outstanding common stock. Id. ¶ 20. He disclosed this second transaction in Amendment No. 1 to his initial Schedule 13D. Id. ¶ 30.

Defendant Jenny Yu is Managing Director of Wise's company, Forward China. Id. ¶ 15. She and Wise "have been business partners for many years in various capacities and have had several pooled investments together." Id. ¶ 24. In 2012, Wise suggested that Yu join the Forward Board, but Forward declined. Id. Wise then proposed that Yu be permitted to attend the company's Board meetings, which she did on February 8, 2012, February 28, 2012 (by telephone), May 8, 2012, and February 8, 2013. Id. ¶ 25. On April 19, 2013, Yu filed a Schedule 13D disclosing that she had acquired a 5.48% stake in Forward and representing that she had "no understandings,

2

SPA-4

arrangements, relationships or contracts relating to" Forward stock. Id. ¶ 32-33.

Wise commenced his present proxy contest on June 6, 2014, at which time he announced his nomination of himself and three other candidates to the seven-member Forward Board. Id. ¶ 38. On June 26, 2014, he declared that he intended to nominate a full slate of seven directors. Id. ¶ 39. Forward alleges that, although Yu is not among Wise's nominees, she is an undisclosed "participant" in his proxy solicitation. Id. ¶ 55. As of the date of the Complaint, Wise had filed with the SEC four Schedules 14A disclosing information regarding his nominations and proxy solicitations, none of which acknowledged Yu's alleged role. Id. ¶ 43-44.

Based on these allegations, Forward asserts four counts against the defendants. First, Forward alleges that both defendants violated Section 13(d) of the Exchange Act and Rule 13d-1 promulgated thereunder, which require any person who acquires beneficial ownership of 5% or more of any class of securities of a registered company to disclose certain information pursuant to Schedule 13D. See Compl. ¶¶ 45-50; 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13D-1. Two or more persons who "act as a … group for the purpose of acquiring, holding, or disposing of securities" are deemed a "person" for purposes of Section 13(d). 15 U.S.C. § 78m(d)(3). Forward alleges that Wise and Yu formed a secret "group" for the purpose of taking over the company, which they unlawfully failed to disclose on their respective Schedules 13D. Compl. ¶ 49. In

addition, each defendant's Schedule 13D reported only his or her individual holdings of Forward stock. Instead, Forward alleges, the defendants should have reported their combined holdings, totaling approximately 25% of the company, of which both are deemed beneficial owners by virtue of their group affiliation. <u>Id</u>.

Second, Forward alleges that Wise violated Section 14(a) of the Exchange Act and Rules 14a-9 and 14a-12 promulgated thereunder, governing proxy solicitations, by failing to disclose in his Schedules 14A the existence of his alleged arrangement with Yu and the accurate total of his beneficial ownership of Forward common stock, taking into account Yu's shares. Compl. ¶¶ 51-59; 15 U.S.C. § 78n; 17 C.F.R. §§ 240.14a-9, 240.14a-12. Third, Forward requests a declaratory judgment that Wise's nominations of directors to its Board are invalid under the company's bylaws, which require nomination letters to make the same disclosures that are required by Section 14(a) and the rules thereunder. Compl. ¶¶ 60-71 & Ex. A. Fourth, Forward requests a declaratory judgment that both Wise and Yu are "interested shareholders" within the meaning of Section 912 of the New York Business Corporation Law ("BCL"). That section defines an "interested shareholder" as any person who beneficially owns 20% or more of a company's voting stock, and restricts such persons from effecting certain "business combinations" with the company. BCL § 912. Forward asks the Court to declare, that because Wise and Yu, as a group, own 25% of the company, they are each subject to this provision. Compl. ¶¶ 72-80.

Thus, the lynchpin of Forward's case is the allegation that Wise and Yu are "acting as a group" within the meaning of the federal securities laws. Whether a group exists under Section 13(d)(3) turns on "'whether there is sufficient direct or circumstantial evidence to support the inference of a formal or informal understanding between [the defendants]' for the purpose of acquiring, holding, or disposing of securities." Hallwood Realty Partners, L.P. v. Gotham Partners, L.P., 286 F.3d 613, 617 (2d Cir. 2002) (citation omitted). Wise and Yu contend that, because Forward's factual allegations cannot support such an inference, the Complaint should be dismissed.

In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor; its consideration is limited, however, to the allegations on the face of the complaint, documents attached thereto or incorporated by reference, and matters of which judicial notice may be taken. See Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996); Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007). In order to survive a motion to dismiss, a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 500 U.S. 544, 570 (2007)). Mere conclusory statements and "'formulaic recitation of the elements of a cause of action'" are insufficient; rather, a plaintiff must plead "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citation omitted).

In the context of Section 13(d) group claims, this means that the complaint must contain "'enough factual matter (taken as true) to suggest that an agreement was made.'" Chechele v. Scheetz, 819 F. Supp. 2d 342, 346 (S.D.N.Y. 2011) (quoting Twombly, 500 U.S. at 556). While it is true that plaintiff "need not set forth direct evidence of an agreement between [defendants] with specified terms," there must be "evidence that some agreement exists," lest Section 13(d) be used "merely as an eleventh-hour bludgeon for management embroiled in proxy contests." meVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P., 260 F. Supp. 2d 616, 633 (S.D.N.Y. 2003).

To support its allegation that Wise and Yu are acting as a group, Forward argues that the circumstances of their longstanding business relationship — including their past joint business ventures, Yu's present employment at Wise's company (Forward China), and the fact that Wise proposed that Yu become a Forward director (and, failing that, invited her to attend Board meetings) — support the inference that Yu is acting under Wise's direction and control. This argument is unpersuasive. "'Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create the group which is deemed to be a statutory person,'" Transcon Lines v. A.G. Becker Inc., 470 F. Supp. 356, 375 (S.D.N.Y. 1979) (citation omitted), and proof that defendants had "jointly

invested together in other transactions" would not establish that they currently have an agreement with respect to Forward stock. Log On Am., Inc. v. Promethean Asset Mgmt. LLC, 223 F. Supp. 2d. 435, 449 (S.D.N.Y. 2001). Nor does the fact that Wise is Yu's employer suggest that he can direct her personal investment decisions. While it would be reasonable to infer that Yu may feel some pressure to vote her shares in favor of her boss's nominees, that subjective perception would not, by itself, constitute an understanding or agreement. Finally, there is nothing particularly suspicious about Wise's suggestion that Yu attend Forward Board meetings. According to Forward's own allegations, at the time Wise extended his invitation, Forward was about to enter a major sourcing agreement with Forward China. See Compl. ¶ 17. In light of Yu's "significant role within Forward China," id. ¶ 25, the reasonable inference is that her attendance at Board meetings was related to the business between the two companies. In short, nothing about Wise and Yu's relationship supports the inference that they had any agreement or understanding regarding Forward stock.

In an attempt to bolster its claims, Forward argues that Wise's motivation for entering an agreement with Yu, rather than simply purchasing more stock in his own name, was to avoid the restrictions of BCL Section 912. As discussed above, that provision prohibits an "interested shareholder," defined as any person who beneficially owns 20% or more of the company's voting stock, from effecting certain "business combinations" with the company, including mergers,

substantial transfers of stocks or assets, corporate liquidation, and receipt of financial assistance. See BCL § 912. Once Wise's holdings reached 19.66% in October 2012, the argument goes, he could not acquire more shares outright without triggering Section 912, and so pressed his employee and former business partner into service.

This argument has two obvious flaws. First, Wise's holdings approached the 20% threshold in October 2012 because the company exercised its put option, not because Wise actively sought to purchase a larger stake. The contingent nature of his purchase weakens any inference that could be drawn from its size or timing. Second, Section 912 restricts transactions that Wise is not alleged to have entered or even to be planning. It has no bearing at all on the acts he has actually undertaken, i.e., nominating directors and soliciting proxies. Thus, Forward asks this Court to infer that Wise ordered Yu to invest her personal funds in Forward stock, all so that he could avoid triggering a statute that would have no effect on his planned course of action. Such an inference falls far short of plausible. Accordingly, Forward's Section 912 argument cannot salvage its otherwise insufficient "group" allegations. Because all of Forward's claims for relief depend on the existence of such a group, its Complaint must be dismissed.

Finally, Forward requests that, should the Court find its pleadings inadequate, it be granted leave to amend. However, "[a] party seeking leave to amend must provide some indication of the substance of the contemplated amendment in order to allow the Court

**SPA-10**

to apply the standards governing Rule 15(a)." <u>Chechele</u>, 819 F. Supp. 2d at 351. Forward provides no such indication in its briefing. At oral argument, the Court expressly invited Forward to explain what additional facts it would include in an amended complaint, but Forward failed to do so. <u>See</u> Transcript dated Sept. 15, 2014, at 13:7-15. In the absence of any basis to find that the defects in the present Complaint could be cured through amendment, the Court denies Forward leave to amend.

Accordingly, defendants' motions to dismiss for failure to state a claim are hereby granted with prejudice.[1] The Clerk of the Court is directed to enter judgment dismissing the case.[2]

SO ORDERED.

Dated:    New York, NY
          September 2₀, 2014                    _____
                                               JED S. RAKOFF, U.S.D.J.

---

[1] Although the Court is skeptical of defendants' "ripeness" objection, it need not reach the issue here.

[2] The Court previously issued a "bottom line" Order denying Forward's motion for a preliminary injunction and expedited discovery, and granting, in part, defendant Yu's motion to strike portions of the Complaint. <u>See</u> Order, August 19, 2014, ECF No. 31. However, because the Court now dismisses the Complaint in its entirety and with prejudice, it is no longer necessary to issue a Memorandum explaining the reasons for those rulings.

SPA-11

```
       E9fnfora                    Argument
  1    UNITED STATES DISTRICT COURT
  1    SOUTHERN DISTRICT OF NEW YORK
  2    ------------------------------x
  2
  3    FORWARD INDUSTRIES,
  3
  4               Plaintiff,
  4
  5          v.                        14 Civ. 5365 (RLC)
  5
  6    TERRENCE WISE and JENNY WU,
  6
  7               Defendants.
  7
  8    ------------------------------x
  8
  9                                  New York, N.Y.
  9                                  September 16, 2014
 10                                  5:00 p.m.
 10
 11    Before:
 11
 12                  HON. JED S. RAKOFF,
 12
 13                                  District Judge
 13
 14                    APPEARANCES
 14
 15    OLSHAN FROME WOLOSKY LLP
 15         Attorneys for Plaintiff
 16    BY:  JEFFREY UDELL
 16         ROBERT FRIEDMAN
 17
 17    SKADDEN, ARPS, SLATE, MEAGHER & FLOM
 18         Attorneys for Defendant Wise
 18    BY:  JOSEPH SACCA
 19         MIRIAM TAUBER
 20
 20    DILWORTH PAXSON
 21         Attorneys for Defendant Wu
 21    BY:  GREGORY BLUE
 22
 23
 24
 25
```

SPA-12

```
        E9fnfora                 Argument
 1                  (In open court)
 2                  (Case called)
 3              THE COURT:  I'm ready to hear argument on the
 4      defendants' motion, so let's hear first from defense counsel.
 5              MR. SACCA:  Thank you, your Honor.
 6              Your Honor, the crux of this case are the 13(d)
 7      allegations that Forward makes against Mr. Wise and Ms. Yu.
 8      13(d) requires an agreement.  It is an agreement to acquire,
 9      dispose, hold, or vote securities of a particular issuer; or,
10      stated otherwise, as the Second Circuit has described it in,
11      for example, Morales v. Quintel Enterprises, an agreement to
12      pursue a common objective.
13              THE COURT:  Yes.
14              So the question is, it seems to me, whether given that
15      this is a motion to dismiss, taking all the well-pleaded facts
16      most favorably to the plaintiff, one can reasonably infer to
17      the degree of plausibility required an agreement.  It doesn't
18      have to be a formal agreement.  It can be a circumstantially
19      shown agreement, but it does have to pass those tests.
20              Go ahead.
21              MR. SACCA:  So, your Honor, what I would like to do is
22      talk to you about what it is Forward alleges and then whether
23      that in fact plausibly suggests an agreement.  And it does not.
24              The facts here are few.  The well-pleaded factual
25      allegations in the complaint are few.  There are a lot of
```

SPA-13

E9fnfora                    Argument

1    conclusions in the complaint, but in terms of facts, there are
2    just a handful.
3              Forward alleges that Mr. Wise acquired just under 20
4    percent of its outstanding shares by October of 2012.  It is
5    argued in its papers that an inference that can be drawn from
6    that acquisition in that amount is that Mr. Wise sought to
7    avoid application of the restrictions of New York's Business
8    Corporation Law Section 912, which --
9              THE COURT:  But if I recall your submission, this was
10   really forced upon him.  It wasn't something that he did
11   voluntarily.
12             MR. SACCA:  It was, your Honor.
13             To take this first step of Forward's allegations, the
14   first part of the story, which is that Mr. Wise had intent to
15   take control of Forward and sought to avoid the restrictions of
16   a New York statute that are placed on shareholders of over 20
17   percent of the company, there are two fundamental flaws with
18   this argument that render it implausible.
19             One is Mr. Wise did not volitionally by up to the 19.6
20   percent that he owned.  In October 2011 he entered into a
21   contract --
22             THE COURT:  The second is what does New York Section
23   912 have to do --
24             MR. SACCA:  With anything he's doing.
25             THE COURT:  Yes.  Forgive me for interrupting, but I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-14

1  have read your papers.
2          MR. SACCA:  So there you have it, your Honor.  912
3  doesn't apply to proxy contests, which is all that Mr. Wise is
4  alleged to be doing here, and he didn't volitionally buy up to
5  the 20 percent.
6          So the linchpin of Forward's theory is that Mr. Wise
7  enlisted Ms. Yu to circumvent a statute that has no application
8  to it.  That we suggest is not plausible.
9          The other facts that are alleged are that Mr. Wise and
10  Ms. Yu have a past history of doing business together, they
11  have been partners in businesses before, that she is the
12  managing director of Forward China, a company he owns and that
13  is Forward's largest supplier, and that he recommended her for
14  service on Forward's board.
15          THE COURT:  And invited her to sit in on board
16  meetings when that did not succeed.
17          MR. SACCA:  I was going get to that one separately
18  because I think conceptually the way Forward casts them they
19  are different.  Forward says the three facts, doing business
20  together, the fact that she works for Forward China, which he
21  owns, and the fact that Mr. Wise recommended her to serve on
22  Forward's board, all support the inference that he has a
23  measure of control over Ms. Yu, at least with respect to
24  Forward.
25          We would submit that that again is not plausible.  The

SPA-15

E9fnfora                    Argument
1    fact that they were business partners in the past doesn't
2    suggest anything about one controlling the other.  The fact
3    that he recommended her to serve on Forward's board doesn't
4    suggest he controls her.  She works for Forward's largest
5    supplier.  There are obvious and good and valid business
6    reasons why she would be a useful member of Forward's board of
7    directors, which leaves the fact that she is managing director
8    of Forward China, a company that Mr. Wise owns.
9            Now plainly he owns the company she works for.  He can
10   direct her activities in that context.  But the allegations
11   here don't relate to Ms. Yu's job as managing director of
12   Forward China.  What Forward is alleging is that an investment
13   she made with her personal funds -- and there's no dispute
14   about that.  Forward does not allege that Ms. Yu couldn't use
15   her own money to buy Forward's shares.  In fact, they really
16   buy into that notion because one thing they argue is that one
17   of the reasons Mr. Wise invited her to join board meetings is
18   so she could get comfortable with the investment.  So clearly
19   they are admitting she has skin in the game.  It is a
20   legitimate investment.
21           THE COURT:  Does Mr. Wise own Forward China?
22           MR. SACCA:  Yes.
23           THE COURT:  So he could fire her?
24           MR. SACCA:  Yes, he could.
25           But the question is, is it a reasonable inference to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

SPA-16

E9fnfora                    Argument

1    draw that he would fire her if she didn't handle her personal
2    investments in a way that he liked, or a way that he was
3    directing her to?
4        I don't think there is any other sort of fact that is
5    alleged that would allow that to be a reasonable inference, a
6    plausible inference.
7        THE COURT:  Let me just ask you this:  Even assuming
8    hypothetically that she had a fear that if she didn't vote her
9    shares the way he would have liked, she might be fired -- there
10   is no evidence of that in the record, but assume that
11   hypothetically -- that still would not make them currently in
12   an agreement or part of a group.
13       MR. SACCA:  No.  Because that is not an agreement at
14   all, right.  That might be a motivation for her vote in a
15   certain way.
16       THE COURT:  Extortion to put it politely.
17       MR. SACCA:  If you believe it.  But there is no
18   allegation that Ms. Yu is dependent on her job for her
19   livelihood.
20       If you read Forward's allegations, the impression you
21   get is she is a woman of some means.  She has been in
22   investments with Mr. Wise before in substantial companies.  So
23   really is it plausible that, and really the inference you would
24   have to draw, your Honor, is not that she might want to vote in
25   favor of his candidates because she fears if he found out she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-17

E9fnfora                    Argument
1    didn't -- and I am not even sure how he would find that out --
2    because if he found out she didn't he might fire her, I think
3    there's more you would need.  You would need allegations that
4    he directed her to do this, that he directed her using his
5    authority over her as an employer to say, Ms. Yu, I need you to
6    buy 5 1/2 percent of Forward and then vote those shares for the
7    proxy contest that I am going to launch 14 months from now.
8    Otherwise, I'll fire you.  There is nothing like that alleged
9    in the complaint.
10            THE COURT:  All right.
11            MR. SACCA:  I would just like to address the
12   attendance at board meetings.
13            THE COURT:  Yes.  Thank you very much.
14            MR. SACCA:  Because you did raise that.
15            THE COURT:  Yes.
16            MR. SACCA:  Again, that is no indicia of control.
17   There are valid reasons why she might be invited to board
18   meetings, including that she again works for the company's
19   largest supplier, and the dates of her attendance at those
20   meetings were around the time that Forward and Forward China
21   were entering into agreements.
22            But also Forward's theory -- and it posited this in
23   its brief, and this is the inference it says it wants your
24   Honor to draw -- is that he invited her to these meetings so
25   she could get comfortable with investing in Forward.  He

E9fnfora                    Argument                              8

1   invited her to her first meeting, if you believe the allegation
2   that he was the one who invited her, in February 2012.  He did
3   not even become an owner, a 20 percent owner of Forward until
4   October of 2012, eight full months later, after the company's
5   chairman exercised his put option to require Mr. Wise to buy
6   the shares.
7          She didn't buy until four months after that.  And all
8   of this is in service of this proxy contest that wasn't started
9   until 14 months later, after an intervening directorial
10  election at which neither Ms. Wise nor Ms. Yu proposed anybody
11  to be nominated to Forward's board.
12         So the question is, does this tell a plausible story
13  that there was a scheme in place, accepting their argument that
14  an inference you should draw is that in February of 2012
15  Mr. Wise secured Ms. Yu's attendance at board meetings so she
16  could get comfortable with investing in Forward, that there was
17  a scheme that ran from then, February of 2012, until June of
18  2014, when Mr. Wise launched his proxy contest, all in service
19  of a surreptitious attempt to gain control in which he's
20  scheming to avoid the application of a law that has no
21  application to what he is doing and in which he had her buy
22  shares in a manner that she publicly disclosed.
23         If you are looking for a plausible allegation of a
24  group, what would happen is Mr. Wise would have asked Ms. Yu,
25  assuming he had any control over her, to buy up shares during

SPA-19

```
       E9fnfora              Argument
 1     his proxy contest, so that no one would know she owned them
 2     until it was too late.  Then she would vote in favor of his
 3     nominees.  But to do this all so publicly 14 months before he
 4     ever launches a proxy contest just does not tell a plausible
 5     story that they have an agreement respecting how they are going
 6     to vote their Forward shares.
 7               THE COURT:  All right.  Thank you very much.  I don't
 8     know whether your cocounsel wanted to add anything or not.
 9               MR. BLUE:  I will stand by Mr. Sacca's argument, your
10     Honor.  That's fine with me.
11               THE COURT:  So let me hear from plaintiff's counsel.
12               MR. UDELL:  Thank you, your Honor.
13               Agreed that the 13(d) allegations are certainly the
14     crux of what we have alleged in this complaint.  We just differ
15     with respect to whether the facts that we allege, and they have
16     acknowledged the ones that we do, and the reasonable inferences
17     that can be drawn therefrom amount to the elements of a claim.
18               In our view, they do, and they are plausible theories.
19     I'll get to them in a second, but let me just say by way of
20     preface and overview that Mr. Sacca's comments, some of them --
21     and I'll get to which ones are not -- but some of them are
22     plausible, too.  But that is not the standard, whether there is
23     a plausible defense.  The standard is whether the allegations
24     are plausible, and we respectfully submit that our allegations
25     are plausible.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

SPA-20

E9fnfora                    Argument

1    THE COURT:  Actually, I have a vague recollection that
2    the Supreme Court says that to survive the allegations of a
3    complaint have to be more plausible than an alternative
4    explanation.
5            MR. UDELL:  We respectfully submit that they are, your
6    Honor.  I'm going to get to that right now.  But to suggest
7    that ours are not plausible, which is what they are saying,
8    does not fly for these reasons:  There is a bunch of points
9    that were just made and tracking the briefs.  Let me just take
10   one.  The first one, the notion of whether the defendant Wise
11   was a sort of reluctant 19-percent-plus beneficial owner when
12   his counterparty exercised the put option that put him at that
13   level.
14           The fact is, as disclosed in the complaint, the put
15   option was a feature of his original purchase.  All of this is
16   disclosed in his 13(d), his initial 13(d).  But the put
17   agreement was a feature of his original December 2011 purchase.
18           So it is not as if he's walking down the street
19   minding his own business and all these half a million shares
20   are thrust upon him unwillingly and he's like, whoa, surprise,
21   surprise.
22           Obviously, this is an arm's-length, negotiated
23   transaction which included the feature that enabled the
24   counterparty to put these shares to him within a specific
25   period of time.

SPA-21

E9fnfora                    Argument

1       The transaction documents, as he in fact discloses in
2  his 13(d), also had the feature that allowed them to exercise a
3  call option at the end of that period of time, and should the
4  put not have been issued, he could have exercised a call and
5  purchased those selfsame --
6          THE COURT:  When is the end of that?
7          MR. UDELL:  I believe it was July of '13, pursuant to
8  the terms of the agreement.  But prior thereto, of course, as
9  alleged, the call was exercised by the counterparty.
10          THE COURT:  That's interesting.
11          MR. UDELL:  The point is, they were all a part of an
12  agreement, of transaction documents which he discloses in his
13  public filings and his 13(d), his initial 13(d).  So the notion
14  that he's this unwitting beneficiary or reluctant acquirer of
15  the 19-plus percent is fanciful and counterfactual.
16          THE COURT:  No.  I think their argument was that the
17  otherwise perhaps negative inference that one could draw that
18  it was right up against the 20 percent limit is muted or at
19  least to some extent undercut by the fact that at the relevant
20  time he could have been left with much less.  They would the
21  ones who, by exercising the put, moved it up to 19 point
22  whatever it was.
23          MR. UDELL:  What he's saying is that -- as alleged in
24  the complaint and in fact, his client did not exercise the put.
25  It was the counterparty to the transaction that exercised a put
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

SPA-22

E9fnfora                    Argument

1    that he was thereby obligated to accept and therefore acquire,
2    purchase these extra shares to get him up to a full ownership
3    of the 19.6 percent.
4              But my point is that the notion that, and the argument
5    that they make from that --
6              THE COURT:  Your argument is that it was contemplated
7    that one way or another he could get up to 19.6.
8              MR. UDELL:  Exactly.  And it was contemplated as early
9    as December '11, which is right before he started to request
10   that Ms. Yu be on the board; and, failing that, that she attend
11   meetings and all of that.  So the timing is right in sync with
12   that.
13             Secondly, in any event, even if -- which it's not, and
14   I think the fair inference is that he was contemplating this
15   all along.  By the way, one other point:  The agreement itself
16   I respectfully suggest it is a fair inference that the drafters
17   of the agreement on both sides, and there's nothing sinister or
18   improper in the slightest about it, but it's not a coincidence
19   the amount of shares that he buys gets you up to just shy of
20   20.  Because they are aware of the 20 percent statutory --
21             THE COURT:  I don't think anyone is disputing that the
22   reason it didn't go above 20 was because of BCL law.
23             MR. UDELL:  That's correct.
24             THE COURT:  But what about the argument that in effect
25   Section 912 is irrelevant?

SPA-23

E9fnfora                    Argument

1           MR. UDELL:  OK.  Right.  Here's why it is relevant.
2           First of all, and I don't think that it's required
3   that the complaint spell all of this out, and that I itemize
4   each of the subsections of BCL 912.  As your Honor knows, the
5   statute requires, or provides rather, that when one is an
6   interested shareholder --
7           THE COURT:  I think while we are having this argument
8   today you ought to, if there are things you want to
9   additionally spell out that you would include in an amended
10  complaint, assuming arguendo that I were to find this complaint
11  insufficient but give you leave to amend, now is the time to
12  tell me what those additional things are, including things that
13  you may not have been required to include.  But I would rather
14  have the full story now, and that will assist me in making the
15  determination.
16          MR. UDELL:  Thank you, your Honor.
17          By the way, the argument that we are addressing right
18  now is not, to my reading, raised in their responsive brief.
19  It came up really in the reply, so this is our opportunity to
20  address this.
21          BCL 912 for one, proscribes interested shareholders --
22  so defined once you hit the 20 percent mark -- from, among
23  other things, engaging in certain business combinations -- a
24  term of art, business combinations -- and then it enumerates
25  what is a business combination.

E9fnfora                        Argument

1          There are various examples.  One of them, 912(a)(5)(F)
2    defines business combination as the shareholder's receipt of
3    loans, advances, guarantees, pledges or other financial
4    assistance.
5          There is a question whether Mr. Wise's ongoing
6    business relationship with the company in his capacity as the
7    sole owner of Forward China, the entity that's the chief
8    supplier and controls the supply of Forward, there is a
9    question whether that relationship in and of itself might be
10   implicated by the BCL under that provision.  That's one.
11         Secondly, though, BCL 912 otherwise, and as more
12   commonly known and understood, it's an antitakeover provision.
13   What it says is that interested shareholders can't merge one
14   company into the subject company, companies they own into the
15   subject company; the interested shareholders can't buy 10
16   percent more of the company's assets; and they can't buy from
17   the company 5 percent or more of the company's stock.
18         All of these things are well known, and it's why they
19   call it an antitakeover statute, things that folks do when they
20   are seeking to control a company.
21         We allege full on in the complaint that his goal, his
22   motivation is to control the company.  There is no question
23   that were he to get over the 20 percent, and again even if the
24   agreement itself is structured to hit him up to just shy that
25   of ceiling, there is no question, it can't be seriously argued

SPA-25

E9fnfora                    Argument

1    that BCL 912 would not significantly hamper him from doing a
2    whole range and host of things that folks do to acquire control
3    of the company.
4              I think that is an eminently reasonable inference,
5    that he's motivated by that to stay below the radar.  There are
6    all sorts of other -- today even -- suggestions that counsel is
7    making about, well, if you really wanted to do it, he could
8    have had her buy 4.9 percent, and then crossed the threshold
9    and not filed the 13(d) until the last minute.
10             These are the types of arguments that criminal defense
11   lawyers make all the time.  I couldn't have done the crime.
12   I'm not guilty because I could have done it a different way,
13   which would have been more successful.  Sure.
14             But, again, back to the law here, and I gather your
15   Honor has the answer under Iqbal or Twombly, but the fact is we
16   respectfully submit that our allegations are eminently
17   plausible, that there is this coordinated activity.
18             What distinguishes this case from, their briefs cite a
19   bunch of cases, they say it has been held that, you know, just
20   because there is a mere business association, that's not
21   enough.  These other cases are cases where you have hedge
22   funds, independently acting hedge funds they buy up, and there
23   is the allegation, oh, maybe they are coordinated.  And then
24   discovery reveals -- and, by the way, that's another
25   distinguishing factor that almost all of their cases, I think

SPA-26

E9fnfora                    Argument

1    with the exception of one, are at the PI, post expedited
2    discovery or discovery stage.  But the evidence reveals that
3    either there was a contrary agreement, you know, that there was
4    a so-called blocking agreement where they agreed they wouldn't
5    go over the threshold amount to get group status or 13(d) 5
6    percent status.
7              There are cases where the courts in most of these are
8    saying these are independent actors.  They are business parties
9    that make up their own minds, and so what if they happen to be
10   interested in the same stock at the same time.
11             The distinction here, your Honor, is you have two
12   individuals essentially.  Yes, they have this historical
13   relationship that shows financial association and past history
14   and dealings, but that is not what we are saying is the only
15   basis for the inference.  The inference that we are drawing, it
16   is that plus the context here is she is his employee.
17             So, it is, again, a straw argument for him to say, oh,
18   the complaint doesn't allege and it would be implausible to say
19   that he directed her and ordered her to buy the shares so he
20   can vote them.
21             We don't have to allege that.  What we are alleging,
22   what is set forth in the complaint is she's his sole -- or he's
23   her employer.  It's simply implausible to think that under
24   these circumstances where she's buying the shares that she
25   doesn't have an agreement with her employer to either vote,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-27

E9fnfora                          Argument

1   dispose of, or acquire more shares.
2           THE COURT:  I'm not sure that's so obvious to me.
3           I think it's a reasonable inference that she would
4   feel pressured to vote those shares the way he would like.  But
5   that's not the same as saying that the two of them have an
6   agreement.
7           It is much more like the nature of their relationship
8   is hierarchical, and therefore she feels the same pressure that
9   anyone feels to please their boss, but that doesn't mean have
10  an agreement with your boss.
11          MR. UDELL:  In the abstract, is it plausible that
12  there is none?  You know, sure.  But, again, we are saying that
13  if you take all the allegations in the complaint, where you
14  have this many, many years of coordination.
15          THE COURT:  When did she buy her shares?
16          MR. UDELL:  That is another point.  I thank your Honor
17  for raising that.  As alleged in the complaint, she files her
18  13(d) in April of 2013.  Under the regulations, as your Honor
19  knows, you're required to disclose your purchases within the
20  last 60 days from the filing, so she discloses purchases going
21  back to February of 2013.
22          Counsel for Mr. Wise has repeatedly said, oh, she
23  bought all her shares in February, you know, from February of
24  '13.  In the reply brief they make the argument, oh, it's
25  implausible to think that it was instigated by Mr. Wise at all

SPA-28

E9fnfora                    Argument

1   because it was so long after, it was four months after he
2   acquired his full ownership of the 19 percent from October the
3   year before.
4            But the fact is she didn't acquire all of her 5
5   percent -- what's the number?  It's 444,217 shares -- from
6   February onward.  It's roughly 75 percent of them, I believe,
7   more or less, give or take a few points, that she disclosed
8   within that period.
9            So we don't know when she started to acquire the first
10  25 and that whole block of shares.  Frankly, that's something
11  that the discovery will reveal and may very well be telling in
12  and of its own right.  But for purposes of this motion, what is
13  alleged in the complaint, it's not accurate to say that she
14  bought all of her shares starting in February.
15           THE COURT:  You allege that after she was not made a
16  member of the board that Wise invited her to sit in on board
17  meetings.  Was she the only nonboard member who sat in on those
18  meetings?
19           MR. UDELL:  This of, course is, going outside of what
20  is in the complaint to answer that.
21           THE COURT:  I am willing to talk about that based on
22  the possibility that I would give you leave to amend, but I
23  wouldn't give you leave to amend if you had nothing new to add.
24           MR. UDELL:  Right.
25           THE COURT:  This is all on the hypothesis that I would
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

SPA-29

E9fnfora                    Argument
1   otherwise dismiss, which I haven't decided one way or the
2   other.  So what can you tell me about that?
3           MR. UDELL:  Again, don't hold me to it, your Honor.  I
4   can say for certain my understanding is that there were other
5   nonboard members present that were certainly counsel and
6   counsel to the company who were present.
7           THE COURT:  Let me put it differently.  How do you
8   know?  Presumably you know from the other board members,
9   presumably you have access to them.
10          MR. UDELL:  Your Honor, it is just a question of what
11  my memory is standing here today.
12          THE COURT:  OK.  Fair enough.
13          MR. UDELL:  My firm was company counsel to Forward,
14  and so I can tell you frankly I have seen board minutes during
15  that period as well.
16          My recollection here -- now please don't hold me to
17  it, because I don't have it in front of me.
18          THE COURT:  That's fine.
19          MR. UDELL:  I don't recall other investors let's say
20  in the company shareholders present at meetings.  There
21  certainly were nonboard members present in the form of
22  professional advisers of one kind, financial or legal.  But
23  this is, I would tell you --
24          THE COURT:  A question I will put this to your
25  adversary as well -- of course, at this point we don't have the

SPA-30

E9fnfora                     Argument

```
 1    specifics, presumably plaintiff could obtain them if necessary,
 2    if it made a difference.  I think it is unusual for someone who
 3    is not a member of the board to be regularly sitting in on
 4    board meetings.  How many meetings did she sit in on?
 5              MR. UDELL:  It is alleged in the complaint, your
 6    Honor.  May I have a second, your Honor.  We allege in
 7    paragraph 25 that she attended board meetings on four
 8    occasions.
 9              THE COURT:  Over a period of what number of board
10    meetings there were during that period, if you know?
11              MR. UDELL:  I believe it's over a one-year period,
12    your Honor.
13              THE COURT:  All right.  So the question I would put,
14    and I'm not sure which way this cuts, but just so that defense
15    counsel can respond to it as well when we get to defense
16    counsel, I think from other cases I have had before me
17    involving meetings of boards and to a certain extent what one
18    might call the common sense of it, it is, of course, standard
19    for people like the outside counsel to be at board meetings or
20    the inside counsel for that matter, one or the other or both.
21              It is not uncommon if you have a chief financial
22    officer who is not a member of the board for that person to be
23    regularly invited to board meetings.  It is not I think so
24    common for an outside supplier, even if it is your main
25    supplier, to be regularly at board meetings.  They are not
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-31

E9fnfora                    Argument
1    serving any obvious purpose.  They are sort of onlookers.
2            I don't want to push this too far because we don't
3    have enough of the facts as alleged presently to know where
4    this cuts, and this is information which presumably would be
5    well within the purview of plaintiff's counsel, given his
6    access to board minutes and the like.  But it would be
7    interesting, I suppose -- maybe not dispositive, maybe not even
8    material, but possibly material anyway, certainly
9    interesting -- to know how many other similarly situated
10   people, if any, were invited to more than a very occasional
11   meeting.
12           I'm sorry.  I didn't want defense counsel to respond
13   yet.  I want plaintiff's counsel to finish all of his remarks.
14           MR. UDELL:  I think I covered the arguments.
15           THE COURT:  Maybe you have covered it.  Very good.
16           MR. UDELL:  In our colloquy I think I have addressed
17   them, unless the Court has a specific question.
18           THE COURT:  That's fine.
19           Then it's time to hear from defense counsel.
20           Thank you very much.
21           MR. SACCA:  Your Honor, there are just a couple of
22   points I want to respond to.
23           One is the question of the option.
24           THE COURT:  Before you do that, your colleague was
25   chomping at the bit to respond I thought to my last question.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

SPA-32

E9fnfora                    Argument
1            MR. BLUE:  I will sit in deference to cocounsel.
2            MR. SACCA:  I think it was a point we were both going
3    to respond to.
4            THE COURT:  His chomp has been stopped I see.
5            MR. SACCA:  But to start with the first point raised,
6    the option, yes, it was, in fact, part of the agreement with
7    Mr. Wise and the company's chairman reached in December of 2011
8    that the chairman would have a put option and Mr. Wise had a
9    conditional call option.
10           None of this, of course, is alleged in the complaint.
11   These agreements are described in the 13(d)s.  The conditional
12   call option would have allowed Mr. Wise to purchase shares I
13   believe in July of 2013, June or July of 2013 if certain
14   conditions were unsatisfied.  Those conditions as I remember
15   them were all entirely in the company's control.
16           But anyway I don't think it affects the plausibility
17   analysis here, because the put option was just that, an option.
18   And it was not an option that was out of Mr. Wise's control.
19   It was up to the board's chairman whether he was or was not
20   going to sell his shares to Mr. Wise.
21           You can't force your counterparty to exercise a put
22   that defeats the purpose of an option.  So the notion that this
23   was all part of a concerted scheme by Mr. Wise where he left a
24   huge part of its success in the hands of his option
25   counterparty is just not plausible.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

SPA-33

E9fnfora                    Argument

1        But if you are inclined to agree with it, then all
2   Forward has done is now backed up the date of the start of all
3   of this to a scheme hatched in December of 2011 in service of a
4   proxy fight not launched for two and a half years.  Talk about
5   a long time, your Honor.  Corporate raiders or not usually that
6   patient.
7        Then Mr. Udell, because he's trying to fix this 912
8   problem that he has, is now suggesting -- and again none of
9   this is alleged in the complaint, nor could it I think be
10  alleged consistent with Rule 11 -- that Mr. Wise might, if he
11  succeeds in his proxy contest, then cause Forward to engage in
12  some kind of transaction that would otherwise come under the
13  purview of 912.  It is just rank speculation and there's
14  nothing in the complaint to suggest that.  But all that would
15  do is extend the time period further.  Now we've got this
16  scheme that's going on for something approaching three years.
17       Mr. Udell did offer the possibility, a musing if you
18  will, that the contract between Forward China and Forward could
19  somehow fall within the purview of 912 as a loan between a
20  company and a shareholder.  I have no idea how.
21       But in all events we can put a knife right through the
22  heart of that one here and now, because the board has approved
23  every contract between Forward China and Forward, and every
24  board approval gets you out of 912 anyway.  So we are left with
25  the only kind of transaction, the only kind of deal Mr. Wise is

24

E9fnfora                    Argument
1   attempting to move Forward is his proxy fight, and even
2   Mr. Udell couldn't get up and tell you that proxy fights are
3   governed by 912.
4           So this last point, the board meetings, Ms. Yu
5   attended four board meetings, February 8, 2012, a telephonic
6   board meeting on February 28, 2012, and a board meeting on May
7   8, 2012.  The complaint alleges that Forward entered into its
8   contract with Forward China in March of 2012.  So those three
9   meetings are all roughly coterminous with the execution of that
10  agreement, and two of them immediately preceded the execution
11  of the agreement.  The last agreement was a year later, roughly
12  a year later, in February 2013.
13          But this speculation that Mr. Udell was trying to
14  engage in about why Ms. Yu might or might not be invited, who
15  else, it's really resolved by Forward's own complaint, because
16  it says why it agreed to have her at its board meetings.  It
17  was because of her significant role within Forward China.  That
18  is a quote from paragraph 25 of the complaint.
19          So Forward has explained why it saw fit to have Ms. Yu
20  at their board meetings.  I think that should answer some of
21  the Court's questions about whether this is usual or routine,
22  if there was a good reason or for it or not a good reason for
23  it.  Forward has explained why it thought she was worthy of
24  being there.
25          Also, of course -- I think I'm stealing Mr. Blue's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

SPA-35

E9fnfora                    Argument

1   thunder here -- Mr. Wise had proposed that she join the board,
2   and it's entirely possible that he was suggesting and Forward
3   agreed, well, if she's going to, or, you know, if there is a
4   possibility, maybe she should get up to speed.  But I don't
5   think there's anything, especially given Forward's explanation
6   for why she was there, particularly curious about the fact that
7   she was there.
8           THE COURT:  All right.
9           MR. UDELL:  Your Honor, may I just respond briefly?
10          THE COURT:  Go ahead.
11          MR. UDELL:  I was reminded of a point that was maybe
12  in the briefs.  I was getting to it today and I omitted to
13  state it.
14          The whole notion that the shares were thrust upon
15  Mr. Wise by virtue of the put option and therefore it's
16  inconceivable they would have had this contingent plan is
17  really a red herring because the key fact that we allege in the
18  complaint is that he became a 19.6 plus percent shareholder.
19          That's not disputed.  That is in the complaint.  The
20  point is at that point that he has the agreement with Ms. Yu,
21  and she then certainly buys significant amount of shares
22  thereafter when he is capped out so to speak.
23          We are not required to allege precise terms, and
24  certainly not, as your Honor pointed out, whether it is a
25  granting or not of the plan.  Counsel keeps harkening back to
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

SPA-36

E9fnfora                    Argument

1  well, it's so implausible, all these contingent factors, the
2  fact is in real life to me we respectfully submit it's
3  eminently plausible.  The plan is not so defined and black and
4  white, at least in the earlier, nascent stages.  You can have
5  contingent events.
6          What we fairly allege in our complaint is that by the
7  time he becomes the 19-plus shareholder, whether it's by a put
8  or not, and for all the reasons we stated the put was
9  contemplated at that point, the clear fact is that he is
10  bumping up against 912.  It is irrefutable that 912 does impose
11  restrictions on anyone who crosses it.  That's why it's fair to
12  infer an agreement originally that puts him at that number, and
13  he's acting with the intent to avoid it.
14          He needs votes for the proxy contest.  To get
15  directors on the board, you need votes, extra shares are votes.
16  That's the way to get extra votes, is by agreeing with someone
17  else sub silentio to have them acquire the extra shares.  That
18  is what is alleged in the complaint.
19          Far from being implausible that, we respectfully
20  submit, is entirely plausible.
21          THE COURT:  I thank all counsel for this very helpful
22  argument.  Because this is a motion to dismiss I think it's
23  important that I get you a decision promptly.  What I will
24  undertake to do is get you a bottom-line decision by a week
25  from today with opinion to follow.  I doubt I will have an

SPA-37

27
```
    E9fnfora                   Argument
1   opinion at that point, but that will tell you what you need to
2   do as to whether you are moving forward or not.  So you will
3   get the bottom line by next Monday.
4           I thank all counsel, and this matter will be taken
5   under advisement.
6           MR. UDELL:  Thank you.
7           MR. SACCA:  Thank you, your Honor.
8           (Adjourned)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SPA-38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
FORWARD INDUSTRIES, INC.,                    :

                               :    14-cv-5365 (JSR)

     Plaintiff,                             :

                               :        ORDER

      -v-                                :

                               :

TERENCE BERNARD WISE and JENNY YU,            :

                               :

     Defendants.                            :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

    Forward Industries, Inc. brings this suit against two of its

shareholders, Terence Wise and Jenny Yu, alleging that they violated

the federal securities laws by failing to disclose that they had

formed a "group" within the meaning of 15 U.S.C. § 78m(d)(3).

    Before the Court currently are plaintiff's motions for a

preliminary injunction and for expedited discovery, and defendant

Yu's motion to strike, pursuant to Federal Rule of Civil Procedure

12(f), paragraphs 22, 26, 27, 36, and 37 and the last sentence of

paragraph 4 from the Complaint.  Upon consideration, the Court

denies plaintiff's motions for a preliminary injunction and for

expedited discovery.  The Court grants defendant Yu's motion with

respect to striking paragraphs 27, 36, and 37 and the last sentence

of paragraph 4, but denies it with respect to paragraphs 22 and 26.

A memorandum explaining the reasons for these rulings will issue in

due course.

    Pursuant to the Court's directions given in open court on

August 18, 2014, see transcript, defendants shall file any motions

1

SPA-39

to dismiss on August 28, 2014; plaintiff shall file its answering

papers on September 5, 2014; defendants shall file their reply by

September 10, 2014; and oral argument on defendants' motions shall

be held on September 15, 2014 at 4:00pm, at which time the parties

shall submit a proposed case management plan pursuant to which this

case shall be ready for trial by December 31, 2014.

The Clerk of the Court is directed to close document number 11

on the docket of this case.


        SO ORDERED.

Dated:     New York, NY
           August 19, 2014                    _____
                                              JED S. RAKOFF, U.S.D.J.

2

SPA-40

1

E8irform

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FORWARD INDUSTRIES, INC.,

4                   Plaintiff,

5           v.                          14 Civ. 5365 (JSR)

6   TERENCE BERNARD WISE,
    JENNY P. YU,
7                                       Argument

                    Defendants.
8   ------------------------------x

9
                                        New York, N.Y.
10                                      August 18, 2014
                                        4:45 p.m.
11  Before:

12          HON. JED S. RAKOFF

13
                                        District Judge
14

15

16          APPEARANCES

17

18  OLSHAN FROME WOLOSKY LLP
            Attorneys for Plaintiff
19  BY:  JEFFREY UDELL

20
    SKADDEN ARPS MEAGHER SLATE & FLOM LLP
21          Attorneys for Defendant Wise
    BY:  JOSEPH SACCA
22       MIRIAM TAUBER

23
    DILWORTH PAXSON LLP
24          Attorneys for Defendant Yu
    BY:  GREGORY BLUE
25  EXAM

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

SPA-41

E8irform

1

2          (Case called)

3          MR. UDELL:  Good afternoon, your Honor.  Jeffrey Udell

4   for plaintiff, Forward Industries.

5          THE COURT:  Good afternoon.

6          MR. SACCA:  Good afternoon, your Honor.  Joseph Sacca

7   with my colleague Miriam Tauber for Terence Wise.

8          MR. BLUE:  Gregory Blue for defendant Jenny Yu.

9          THE COURT:  Good afternoon.  Let's deal with the

10   motion for preliminary injunction and expedited discovery.  Let

11   me hear on that motion first from plaintiff's counsel.

12          MR. UDELL:  Thank you, your Honor.  I'm sorry.  You

13   wanted to hear first on the motion for expedited discovery or

14   for the injunction?

15          THE COURT:  Really the injunction.

16          MR. UDELL:  That's what I thought.

17          THE COURT:  If you are not entitled to the injunction,

18   there is no reason to give you expedited discovery, is there?

19          MR. UDELL:  Well, your Honor --

20          THE COURT:  We'll deal with that in a bit.  Let's

21   start with the injunction.  Where is your irreparable harm?

22          MR. UDELL:  Your Honor, the irreparable harm is that

23   there is a proxy contest going on right now.

24          THE COURT:  If you are right, I suppose the worst case

25   is that anything that results can get undone.  The basic facts

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-42

E8irform

1    were known to you way back in April of 2013.  You had a whole

2    little investigation which, near as I can tell, and we

3    discussed this last time and you then looked into it, was, you

4    said, there was some smoke but nothing that constituted fire.

5          MR. UDELL:  Your Honor, as set forth in the

6    affidavits, really the question that the Court posited last

7    time, which was a fair one, was really not able to be answered.

8    As the Court posited, you said you wanted to hear what the

9    special committee found; if they found that they were a group,

10   what did they do about it; if they found that they weren't a

11   group, why are you claiming that they are a group now.

12         THE COURT:  As I understand it, correct me if I'm

13   wrong, what they found was suspicious circumstances but nothing

14   dispositive.

15         MR. UDELL:  Your Honor, at the time they considered

16   all of the factors in their business judgment and determined at

17   the end of the day that where the defendants Wise and Yu were

18   claiming they weren't a group, on the evidence that they had at

19   that time they made the business judgment that it was not in

20   the company's interest, where they were claiming that they

21   weren't a group and Wise was claiming that he had no intention

22   whatsoever of taking control of the company, that to disrupt

23   the company's chief source of supply --

24         THE COURT:  That's a relevant point and I don't want

25   to dismiss it.  My immediate point is not on the business

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-43

4

E8irform

1    judgment that he exercised, that it wasn't prudent at that time

2    to bring a lawsuit, blah blah blah.  That's relevant, but I'm

3    back to the earlier question, which is did they determine,

4    because they had access, that the two defendants here were

5    acting in concert or not?  My understanding from what you

6    submitted is they didn't make that determination.  They were

7    more than a little, they were suspicious or skeptical.

8            MR. UDELL:  That's right.

9            THE COURT:  But they didn't have anything hard.

10            MR. UDELL:  That's correct, your Honor.  I think what

11    is going on from the defendants' perspective right now is

12    taking your Honor's remarks from our last court appearance, the

13    defense they have crafted out of those remarks is that there is

14    some kind of a waiver or estoppel.

15            THE COURT:  I don't think it is estoppel.  I

16    understand your saying that they made the judgment based on

17    representations from one of the defendants -- did they take

18    over your company? gosh, no -- that it made no sense to bring a

19    lawsuit, but they also really didn't make a determination that

20    they had a basis to bring a lawsuit, true?

21            MR. UDELL:  They didn't reach the determination to

22    bring a lawsuit.

23            THE COURT:  What evidence do you have that they didn't

24    have that these two are acting in concert?

25            MR. UDELL:  We don't have additional evidence of Wise

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-44

E8irform

1    and Yu at this moment acting in concert that was not on the

2    record or out in the domain at the time.  What we have now, and

3    I respectfully suggest to you what properly motivates the board

4    of the company to act, is that Wise at the time swore up and

5    down that he has no designs on controlling the company, and

6    today he is saying that he wants to throw out the bums and wipe

7    the slate clean and bring in his hand-picked directors to

8    control this company.

9              As we said in the papers, under the circumstances,

10   here, unlike the other cases that defendants are citing in

11   their briefs, where you have these disparate hedge funds, like

12   in CSX and these other cases where this is what they are in the

13   business of doing, they invest in stocks here and there.  There

14   is a body of case law out there to assess the factors as to

15   whether they formed various funds, coordinated trading

16   activity, what are the indicia of group activity.

17             This case is a little different.  Here you have a

18   relationship between the two that goes back a very long way.

19   It is not just their status as two folks who have been business

20   partners.  It is more than that.  What you have is two

21   defendants who have been co-investors and their families have

22   been co-investors for many years.

23             Moreover, in this very case, meaning with this very

24   stock, with this very company, there is this relationship where

25   defendant Wise, it's his company, that's the exclusive

SPA-45

6

E8irform

1    supplier, the source of supply that Forward gets its products

2    made through him.  And Yu is not some stranger to that process.

3    She is his managing director.  She is running this company.

4    They are joined at the hip in a way that we respectfully

5    suggest the fair inference is -- coupled with the fact that he

6    is up to a limit of 19-plus percent.

7         THE COURT:  Right.  Maybe I'm a little unclear.  Or

8    maybe I haven't made my question as clear as I should have.

9    There are a bunch of suspicious circumstances.  They could have

10   said, because they have basically the same information you

11   have, that we think they are likely a group, but

12   notwithstanding that, given his representations, we are not

13   going to bring an action.

14         If that were the case, then the fact that now in your

15   view he has, to put it in the most lukewarm way, changed his

16   mind warrants their going Forward.  But that is not what they

17   determined, as near as I can tell.  They said, we can't

18   determine whether they are acting as a group.  We have some

19   suspicions, but we can't determine it.  Then they said, in any

20   event, we are not going to bring a lawsuit based on these

21   representations.

22         The first of those I am concerned with, not the

23   second.  They were in a very good position to find out what

24   they needed to find out about that, and they certainly saw it

25   as part of their mandate to look into that very question, yet

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-46

E8irform

1  they didn't come up with anything.  They came up with smoke but
2  not fire.  There must be a cliché we can employ in this
3  situation.
4       MR. UDELL:  Two thoughts on what your Honor has said.
5  One, when your Honor said they had means available, there
6  wasn't subpoenas issued and process undertaken.  These were
7  three colleagues essentially of Mr. Wise's on the board of
8  directors that form this special committee, were charged with
9  looking into the question of whether there is a group.  That's
10  point one.
11       It wasn't as if there was like this formal subpoena
12  power issued, documents reviewed, and the like.  It was an
13  informal process.  They had a special committee, to be sure,
14  but it wasn't as if they took depositions and reviewed
15  documents.
16       Secondly, I think that your Honor added, when you
17  divided it up into the two sort of conclusions, I don't think
18  they really reached that first one.  They weren't a court of
19  law that had to come up with findings of fact and conclusions.
20       THE COURT:  You would characterize it more as we don't
21  need to reach that conclusion, because we have concluded that
22  in any event, given his representations, we are not going to
23  bring a lawsuit?
24       MR. UDELL:  Exactly, your Honor, that we have
25  determined in any event that is not worth a candle.  Maybe they

SPA-47

8

E8irform

1   avoid the constitutional question if they determine that in

2   their business judgment it wasn't worth a candle.  For that

3   proposition, as your Honor was speaking, I looked at the

4   declaration of Mr. King, the committee member.  At paragraph 12

5   he says --

6           THE COURT:  Let me give these papers to my law clerk

7   to find the affidavit much quicker than I can.

8           MR. UDELL:  It is the affidavit of Owen PJ King,

9   document 13 on the list of this case.  At page 4, paragraph 12,

10  your Honor, is the one that I think you have all been focusing

11  on.

12          THE COURT:  "The 2013 special committee met on several

13  occasions.  Although I and my fellow committee members were

14  skeptical of the professed denials of Mr. Wise and Ms. Yu that

15  they had formed a group with respect to their ownership of

16  Forward stock, we ultimately determined that it would not be a

17  prudent use of the company's resources to elevate our

18  suspicions into a costly litigation with Mr. Wise and Ms. Yu,

19  which also could be severely disruptive to the company's

20  business inasmuch as Mr. Wise and Ms. Yu were in control of the

21  company's exclusive source of supply.

22          "In making that decision, among other things, we

23  relied upon the fact that there were no overt actions then

24  being taken by Mr. Wise or Ms. Yu to effect corporate control

25  or policy.  In addition, I understood that our newly adopted

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

SPA-48

9

E8irform

1    rights plan would offer protections in the event of any joint

2    activity by Mr. Wise and Ms. Yu.  Finally, I believe that it

3    would be appropriate to give my fellow director Mr. Wise an

4    opportunity to demonstrate his good faith."

5             Somewhat Delphic, but at least the interpretation you

6    are giving is a possible one.

7             MR. UDELL:  Your Honor, in the real world he is saying

8    we looked at it, we were skeptical, but at the end of the day

9    we determined it wasn't worth a candle, we took our fellow

10   director at face value.  That's what happened then.

11            THE COURT:  Maybe that's what he is saying.  Or maybe

12   what he is saying is that because they were our exclusive

13   source of supply, they had us by the whatevers, and besides, we

14   had this poison pill or something like, one that we thought was

15   going to work.

16            MR. UDELL:  Those are all factors that he has

17   expressed in this very declaration, your Honor.

18            The point I am trying to make is that we respectfully

19   submit that your Honor should look at what we have before us

20   now.  In other words, it is not a proper defense to the merits

21   of this claim to say you could have looked at it last year and

22   you didn't, so therefore you have waived it or you are

23   estopped.  They don't use those terms.

24            THE COURT:  I don't think it is waiver or estoppel.

25   But before we turn to your adversary, because I'm sure they

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-49

E8irform
10

1    want to comment on all this, I come back to --

2          MR. UDELL:  Irreparable harm.

3          THE COURT:  -- irreparable harm.  Let's say everything

4    you are presently alleging is true:  They have been in

5    collaboration from day one, and, what's more, they lied about

6    it.  If that turns out to be true, which of course they dispute

7    vigorously, why can't whatever election takes place be undone?

8          MR. UDELL:  Your Honor, there is precedent, to be

9    sure, for courts determining that they can wait because they

10   can undo an election.

11         THE COURT:  The case I'm thinking of is by Judge

12   Weinfeld.  In the hierarchy of law, there are some OK judges,

13   like Learned Hand, and there are some modestly good judges,

14   like the first Justice Marshall, and then there is at the very

15   peak, slightly above God, Edward Weinfeld.  He said exactly

16   what you just said about you can always undo an election.

17         MR. UDELL:  I believe there are cases, including those

18   decided by those who must be obeyed, where the holdings are

19   that where there is the potential to change the direction of a

20   company, those are the ones that you can't unscramble so

21   easily.

22         To be sure, they are talking about, among other

23   things, a takeover situation.  But here you have Wise's coming

24   in and he's going to wipe out the entire slate of the board of

25   directors, which gives the opportunity as well for an entirely

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-50

E8irform

1    new set of folks to take the company in who knows what

2    direction and thereby --

3              THE COURT:  Hard to unscramble that egg, is I think

4    the proverbial analogy for that situation.

5              MR. UDELL:  Exactly.

6              THE COURT:  Let me hear from your adversary.  We will

7    come back to you in a minute.

8              MR. SACCA:  Your Honor, Joseph Sacca for Wise.  To put

9    this in context --

10             THE COURT:  It is hard to believe, one might argue,

11   that these two defendants who seemed connected in so many

12   important ways are not acting in concert.

13             MR. SACCA:  Why?  There is no evidence.

14             THE COURT:  How's that for a loaded question.

15             MR. SACCA:  Your Honor, there is no evidence that they

16   have an agreement to vote together, which is what they allege

17   here.  Let me tell you why.

18             THE COURT:  Do you dispute that your client told the

19   board or told the investigating committee that he had no

20   intention of trying to take over the company?

21             MR. SACCA:  No, not at all, your Honor.

22             THE COURT:  This was just something he concocted since

23   then?

24             MR. SACCA:  Your Honor, that was more than a year ago,

25   more than a year ago.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-51

12

E8irform

1        THE COURT:  He just had, what was it, 19.6 percent.

2    Just a convenient little number?

3        MR. SACCA:  Your Honor, let me put that in context for

4    you and let me give you the chronology.  Mr. Johnson, the

5    chairman of the company, approached Mr. Wise in 2011 wanting to

6    sell Mr. Wise his shares.  They entered into a stock purchase

7    agreement with an option.  Mr. Wise bought a million shares in

8    October 2011.

9        In the fall of 2012 Mr. Johnson exercised his put

10    option and forced Mr. Wise to take an additional half a million

11    shares.  He didn't go out and buy those shares.  He didn't

12    volitionally bring himself up to just under 20 percent.  That

13    matters because what he is being accused of is having a secret,

14    undisclosed intent to creepingly get up to control.  The

15    chairman of the company forced him up to 19.6 percent.  In

16    April 2013 he told him, truthfully, I don't intend to take

17    control of the company.

18        Now, what is entirely absent from Mr. King's

19    declaration is the events that followed in the following 14

20    months.  We put the correspondence before your Honor.  There

21    was increasing discord inside the company between Mr. Wise and

22    the directors.  They were doing things he was unhappy with, and

23    those things that they were doing, they were doing in the

24    latter half of 2013 and into 2014.

25        THE COURT:  Ms. Yu acquired her shares before then,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-52

13

E8irform

1    yes?

2            MR. SACCA:  Between February and April of 2013, before

3    then.

4            THE COURT:  This was not the result, was it, of a put

5    or anything like that?

6            MR. SACCA:  No.  These were open market purchases.

7    They bought their shares in entirely different ways.  Mr. Wise

8    was concerned at what he saw were increasing insider

9    transactions between Mr. Johnson and the company.  The company

10   was giving money to Mr. Johnson to invest, he was losing it

11   hand over fist during a bull market.

12           Mr. Wise, he had originally approved that investment

13   strategy, he thought, and other directors agreed with him, that

14   Mr. Johnson was starting to invest the money in ways that he

15   hadn't initially been permitted to.  That was a concern to Mr.

16   Wise.

17           The company, which is a small company based in

18   Florida, started renting office space for its CEO in New York

19   City from Mr. Johnson.  Immediately after it signed the lease,

20   within months, Mr. Johnson raised the rent 4 or 500 percent.

21   That bothered Mr. Wise.  He complained about that.  That was

22   later ratified by a committee of the board of directors.

23           Mr. Wise complained about the composition of the board

24   committees because they were all the same three people.  Every

25   board committee was the same three people.  He complained about

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-53

E8irform

1     that.  He complained about these things to the board.  He was

2     dissatisfied with a preferred stock offering they did in June

3     of 2013 to Mr. Johnson, another one of the directors, insiders,

4     and some other investors that gave them all sorts of

5     preferences over the common shareholders.

6             What Mr. Wise saw was this increasing pattern of

7     insider transactions favoring Mr. Johnson and an increasing

8     disregard for the rights of common holders, which of course he

9     is one.  He finally came to the board and said, look, I think

10    we should replace Johnson as chairman and the CEO should go

11    back to being CEO, and we should get him off the board and

12    place two other people.  The board wouldn't engage him on that.

13            Finally, he came in and said, I am going to nominate

14    two people to replace Johnson and the CEO and I'm going to

15    nominate myself and my nominee as well.  Then, and only then,

16    when the board reacted violently to that and engaged in what he

17    saw as defensive maneuvers without ever engaging him on his

18    nominees, he said, fine, I'm going to nominate everybody.

19            With all of that background, to draw the inference

20    that they are asking you to draw, which is that because he

21    nominated people in June of 2014, he lied in April 2013, when

22    he said I don't intend to do that, is unsupportable.

23            Your Honor, there was an election for directors in

24    September 2013.  If Mr. Wise intended in April 2013 to replace

25    the board, he would have done it then.  Why would he wait a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-54

                                                                            15
E8irform

1   year, when a very significant investment of his is in his view

2   was being mismanaged?  There is no connection between June of

3   2014 and April 2013.  There simply is none, no credible one.

4   There is zero evidence that Ms. Yu has anything to do with Mr.

5   Wise's nominees.  She's not even one of them.  There is just no

6   connection between the two.

7               You asked why wouldn't you believe, because of the

8   relationship between them, that they don't have an agreement.

9   Well, why wouldn't you believe, given her involvement with

10  Forward -- she is the general manager of Forward's largest

11  supplier -- that she might want to have a stake in the

12  company's success?

13              THE COURT:  Exploring various possibilities, let's

14  assume for the sake of argument that for the reasons you have

15  articulated the plaintiff cannot at this stage show a

16  likelihood of success on the merits but they could show serious

17  issues.  An example would be whether it would be reasonable to

18  draw the inference that Mr. Wise lied or not.  If it were, a

19  lot follows from that.  If it isn't, a lot follows on your

20  behalf from that.  I just give that as one example.

21              When we are looking at that prong of the test, the

22  question would then be hardships.

23              MR. SACCA:  Yes.

24              THE COURT:  Why aren't the hardships much more visited

25  upon them than upon you?  At most, assuming you are correct

2767349-1

SPA-55

E8irform

1   about the facts, you suffer some delay.  But they suffer a

2   complete change in the whole management of the company.

3         MR. SACCA:  Your Honor, first I would say it's not

4   true that Mr. Wise just suffers some delay.  That's where I

5   think the core of this comes from.  Really, they have no

6   interest under the securities laws in entrenchment.  There are

7   legions of cases that say the securities laws are not designed

8   to protect incumbent management.

9         The question really is, are the shareholders going to

10  be happy.  I'll answer that in a second.  First let me talk

11  about the tactics and the harm to Mr. Wise, because it is not

12  just delay.

13        On June 6th of this year, Mr. Wise proposed four

14  nominees, put forth four nominees.  That would have given him a

15  majority of the board.  They say they only acted when they

16  thought that he wanted control.  Four is more than half of

17  seven.  That's the moment when Mr. Wise's nominees would have

18  been a majority of the board.  They didn't act.  They waited

19  six weeks after that.

20        What did happen in the interim is the company's final

21  nomination deadline expired, and then they brought this lawsuit

22  after that.  Part of the relief is they are asking your Honor

23  to void Mr. Wise's nomination.  So, the harm to Mr. Wise from

24  an injunction here is not my solicitation gets delayed by ten

25  days or whatever curative disclosure period there might be if

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17
E8irform

1    your Honor were to order that he makes a disclosure, it is he

2    loses his nominees.

3           The harm to shareholders is instead of them being told

4    that Mr. Wise and Ms. Yu are a group, we say they are not, they

5    lose the right to choose.  This goes from a contested election

6    to an unopposed election.  Shareholders don't get to vote, your

7    Honor, if Mr. Wise is enjoined.

8           THE COURT:  Let me if I find out if Ms. Yu's counsel

9    wants to add anything before we go back to plaintiff's counsel.

10          MR. BLUE:  Yes, your Honor, briefly.  I think Ms. Yu

11   finds herself being dragged into the fight going on here, the

12   proxy contest, and that there is no evidence in the papers

13   showing that she has anything to do with the events of last

14   year.

15          She made stock purchases on the open market that were

16   disclosed in the 13D.  She was asked if she was a member of a

17   group, she said no.  That is the sum of the allegations except

18   she is a business associate of Mr. Wise.  She made the

19   purchases.  This is a business she knows about.  She thought

20   actually the company would like that somebody at her supplier

21   would have some skin in the game, have a stake in the success

22   of the business.

23          To answer your Honor's opening question why wouldn't

24   you think they were working together, the cases say that just

25   because you have a business or family or other relationship,

SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

2767349-1

SPA-57

E8irform

1    that's not enough to show that you are acting a group.  They

2    purchased their stock in different ways.  They purchased their

3    stock at different times.  There is nothing to show that Jenny

4    Yu was interested in taking control.

5         THE COURT:  How would you show this through

6    circumstantial evidence other than these kinds of relationships

7    that you are saying are just epiphenomena?  It would be nice if

8    your adversary had a tape recording in which the two defendants

9    say, we are going to jointly take over this company and if

10   anyone asks us, we are going to deny it.  I'm hoping someday to

11   get a case like that, but I don't think I'll live long enough.

12        It is a question of what are reasonable inferences

13   from circumstantial evidence.  Surely they have a more than

14   passing working relationship, from everything I've seen.  Yes?

15        MR. BLUE:  They have worked together, I think the

16   papers show, in a couple of companies, some of which are remote

17   in time, in a consulting arrangement.

18        To answer your Honor's question directly about what

19   would it show, there are cases, for instance, when you look at

20   trading patterns, where one of the defendants purchasing on one

21   day a block and then the other defendant is purchasing a block

22   and you can see that they traded together.  You can have

23   evidence of agreements relating to their overall business.

24        Mr. Udell made reference, and I wrote this down, made

25   reference to the fact that they had been co-investors in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-58

19

E8irform

1    certain things.  I, frankly, don't know what that means.  It's

2    been fully disclosed that they work together in Forward Asia.

3         By the way, this goes to something we mention in our

4    papers.  The cases also show that if the stockholders get the

5    information about the relationship between their parties, that

6    is essentially sufficient.  He wants to go the next step to say

7    this is a group.

8         But in terms of stockholder protection, the real

9    purpose of 13d here, they have disclosed that they work

10   together, they have disclosed their stock purchases.  If the

11   shareholders want to draw an inference from that that they must

12   be working together, I suppose they could.  That would be an

13   incorrect inference.

14        I do think that the cases show you can't just say they

15   know each other and they have worked together for a long time,

16   therefore they must have an agreement.  It's not enough to lump

17   them together because they have worked together.

18        THE COURT:  Let's go back to plaintiff's counsel.

19   Thank you.

20        MR. UDELL:  Thank you, your Honor.

21        Working backward with the arguments raised by Mr.

22   Blue, when Mr. Blue says that they worked together in some

23   companies and he is not sure Wise and Yu are co-investors,

24   first of all, they are working together in this very company,

25   that is, Forward China, the privately owned, wholly owned

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-59

20

E8irform

1  company by Mr. Wise that is the exclusive supplier of Forward,

2  the plaintiff.  And she is the managing director in this small

3  company.

4           In the very company that is at issue and relevant here

5  and has a material interest, it goes without saying that where

6  you control the supply to this public company with your

7  privately held company, there is a real significant issue as to

8  what is paid by the public company for the private services.

9  She is the managing director of that company.  I would submit

10 that is the most relevant kind of connection you could have and

11 where their interests are aligned.

12          Secondly, I used the term "co-investors," and I

13 apologize for loosely throwing that around.  To be more

14 precise -- and this all comes from the affidavits Mr. Wise and

15 Ms. Yu submitted in this case.  We had some of the sketches of

16 this from our side in the complaint and in our moving papers,

17 but to their credit, the defendants filled it out and

18 acknowledged all of these connections.  They are as follows.

19          First of all, a company called Just Wise, founded by

20 Mr. Wise, at one point was half owned by Mr. Wise and Jenny

21 Yu's family.  Jenny Yu was on the board of that company.  This

22 goes back to the '90s, since '94 or '5, I believe.  For eight

23 or nine years she was on the board.

24          Ultimately, Mr. Wise sold his whole interest in the

25 company to Jenny Yu's family and then in 2011 bought back the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-60

E8irform

1   entire company from Jenny Yu's family.  That is a

2   back-and-forth investing pattern with Ms. Yu's family, and she

3   was on the board of that company Just Wise founded by Mr. Wise.

4          Secondly, there is a company called Eurofresh, where

5   once again Mr. Wise and Ms. Yu's family were partners.  They

6   acknowledge that in that endeavor Ms. Yu's family bought out

7   Mr. Wise in or about 2009 entirely.  So he sold it to them in

8   that case.

9          You have a pattern here where these families are close

10  enough that they are investing.  Whether you call it a

11  co-investor, I don't know what the term would be.  But these

12  were the facts as they are alleging them in their own

13  affidavits or declarations.

14         Then you have an entity called Doheny Limited, which I

15  found very interesting, the name of that company.  Mr. Wise

16  says in his affidavit that it's a company that he owns wholly

17  through which he supplies consulting services to the Yu family.

18  What I thought was interesting about the name Doheny was that

19  is the name of the street that is the address for Ms. Yu's

20  apartment in Los Angeles.  This is what we have on her 13D that

21  she filed.

22         Smoking gun?  I'm not trying to overplay it, but the

23  point is he portrays it as, I provide some consulting services

24  to their family.  I suggest it certainly seems like it is an

25  exclusive type of arrangement, that it is that close, it is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                22
        E8irform

1    that sort of closely tailored for her family.

2            The point is she is from a family, and she herself

3    with Mr. Wise had a very -- there is nothing nefarious about

4    it.  There is nothing improper, and we are not alleging there

5    is anything improper about any of these relationships that I

6    have just described that they have acknowledged in their

7    affidavits.

8            But what is significant for purposes of this case is

9    that there is ample evidence that in light of all of that

10   history and, more specifically, what I started with, her

11   serving as the director of this entity that he owns now that

12   does business with Forward, her attendance at the board

13   meetings here, that is enough of a relationship that we would

14   respectfully suggest, how can they not say that there is no not

15   an agreement at least implied?

16           As your Honor stated, in these cases, in criminal

17   conspiracy cases, you're not going to have people sitting

18   around the room saying, we are going to conspire.  But this

19   kind of evidence that we have here we respectfully suggest is

20   ample for you to infer.

21           Frankly, once we have the discovery, now moving to

22   some of the things that Mr. Sacca said about Mr. Wise, what we

23   don't know really is what Ms. Yu's trading patterns were.  What

24   I mean by that is this.  Mr. Wise, as Mr. Sacca correctly

25   states, acquired his shares from Mr. Johnson, the chairman of

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

2767349-1

SPA-62

E8irform

1   Forward.  He acquired the last 500 share shares via a put to

2   him, which took him up to the 19.6.  We are not disputing that.

3           But at that point he owns 19.6.  He is obviously well

4   aware of New York BCL that would impose severe handcuffs on his

5   ability to do things with Forward.  Maybe the supply

6   arrangement might be viewed under that statute as a business

7   combination.  So he is well aware that he cannot at that point

8   go beyond that 20 percent threshold.

9           At some point months after that, months after that,

10  Ms. Yu files her 13D.  As your Honor knows, a 13D doesn't

11  require you to set forth every trade in the stock.  It requires

12  you put forth those in the last 60 days.

13          First of all, by the way, when she filed her 13D, she

14  did not even put forward those trades.  So she files a D that

15  is deficient on its face, not even telling you, the reader, or

16  the SEC or the shareholders, when she bought her shares.  The

17  company writes her a letter and complains about that as well as

18  her being in a group with Mr. Wise.  She denies the group but

19  she says, you got me on the shares, I'll correct that.  She

20  then files an amended D that shows when in the last 60 days she

21  purchased shares.

22          Those shares, and I apologize, your Honor, I don't

23  have the number in front of me, but they are not a hundred

24  percent of her 5 percent ownership.  My recollection is it was

25  something like two-thirds or possibly even three-quarters

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-63

E8irform

1  maybe, but not that much of her share purchases.  So we don't

2  know when she started buying shares.

3          In fact, there was one share purchase.  I believe the

4  date was February 5th.  She acknowledges in correspondence with

5  the company when she says, you're right, I should have

6  disclosed this 60.  Here they are in an email to the company

7  counsel and the board, I believe, which email preceded by a day

8  or so her refiling the amended 13D.  There was one extra trade

9  which she put in the email that didn't make it to the D.

10          The timing of some of these trades is interesting.  I

11  know we will talk in a moment about Ms. Yu's motion to strike

12  alleged surplusage.  But the timing is interesting in terms of

13  when she attended board meetings and when she made her share

14  purchases.

15          The point is this.  We don't know what her trading

16  records are and what the patterns are.  I respectfully submit

17  it would be pretty interesting to see when it was that she

18  started to buy in relation to all sorts of events going on with

19  the company, going on with the board meetings, going on with

20  Mr. Wise.

21          She was privy to all of this kind of stuff because she

22  was attending board meetings as a guest, with the permission of

23  the board, to be sure, but not surreptitious.  But at his

24  insistence or suggestion.  She was also privy to a wealth of

25  knowledge about the company in terms of her role as managing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-64

E8irform

1     director of his supply company.

2           That is with respect to the evidence that we still

3     need to know.

4           Finally, Mr. Sacca's point, I wanted to respond to it.

5     He suggests how can you suspect Mr. Wise of wanting to control

6     the company; if he really wanted to control the company, he

7     could have done it last year, so obviously how can you say

8     that.  That argument sort of reminds me of when you hear the

9     criminal defense that, well, he didn't rob this other bank that

10    he went to and this third bank that he passed three times, so

11    how could he have robbed this one.

12          It's logical for him to have concluded that the time

13    is right now and now he wants to assert control.  He could have

14    had this in his back pocket and he is trying to strike now.

15          The real issue, it all boils down to what is the

16    intent of the two defendants with respect to the shares.  We

17    respectfully submit that you have enough here to draw the

18    inference that there is at the very least an implied agreement

19    to do one of three or four actions with respect to the shares,

20    that is, acquire them, hold them, vote them, or dispose of them

21    in some coordinated fashion.

22          THE COURT:  Let's switch gears.  I'm sorry, go ahead.

23          MR. SACCA:  Your Honor, there were just a couple of

24    points I wanted to respond to.

25          THE COURT:  Go ahead.

**SPA-65**

E8irform

1      MR. SACCA:  I think this will show you how flimsy

2  these allegations are.  This whole Doheny Road thing, Mr. Wise

3  formed and named that company in 2003.  Ms. Yu I understand her

4  bought her apartment on Doheny Road in West Hollywood sometime

5  in 2008.  I'm not sure what the fact that she happened to move

6  to a street that bears the name of his company five years after

7  he named it is supposed to symbolize, but I don't think it

8  symbolizes an agreement to vote their Forward shares in tandem.

9      MR. UDELL:  Maybe she bought his apartment that he

10  owned.

11      THE COURT:  Go ahead.

12      MR. SACCA:  Your Honor, that all boils down to the

13  point.  Make no mistake about what they are asking you to do

14  here.  They are asking you to end this proxy contest in their

15  favor through issuance of a preliminary injunction.  That

16  shouldn't be done based on speculation, based on we might later

17  be able to prove.  Your Honor, if you issue an injunction, the

18  proxy contest is done.

19      THE COURT:  I understand.

20      MR. SACCA:  Mr. Wise can't file a 13D saying I have an

21  agreement, because that would be a lie.

22      THE COURT:  All right.

23      MR. UDELL:  Your Honor, may I make one quick point on

24  that last one?

25      THE COURT:  Yes, but I want to move on.

2767349-1

SPA-66

27

E8irform

1          MR. UDELL:  Very quickly, and I wanted to answer that

2    before.  Counsel accuses the company of acting deliberately in

3    waiting for the time to expire.  He filed his nomination, the

4    first nomination, less than three weeks before the deadline and

5    his second nomination, which is the one purportedly pending, to

6    wipe out the whole slate, the day before the deadline.  So,

7    there is no litigation, even with all due respect to your

8    Honor's rocket docket, that could be decided prior to the one

9    day after he filed his nomination.

10          THE COURT:  Rocket docket?  I would prefer the term

11   "efficient expedience."

12          Let's turn to the request for expedited discovery.  If

13   I grant the preliminary injunction, I think that's moot.  If I

14   deny the preliminary injunction, I think it is moot.  The only

15   reason I would grant expedited discovery, unless I'm missing

16   something here, would be if I can't decide on the record before

17   me now whether an injunction should issue and I think that

18   materially important facts would be developed that would help

19   me to decide that.  To be frank, I think that is unlikely.  I'm

20   somewhat mystified as to the need for expedited discovery

21          MR. UDELL:  Your Honor, even should your Honor deny

22   the injunction, requested injunction, which we respectfully ask

23   that you not do, but even if you were to deny it, we would be

24   asking for the swiftest possible discovery and trial in this

25   case.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-67

E8irform

1           THE COURT:  That's a separate question, I think.  If

2     that's all you're asking for, your case management plan has

3     already reflected that.

4           MR. UDELL:  In the event you denied it.

5           THE COURT:  Right.  So it is not for the purpose of

6     deciding the injunction motion.  You say there is an

7     independent need to move this forward.

8           MR. UDELL:  Yes, your Honor, no pun intended.

9           THE COURT:  I'm all for moving things forward rapidly,

10    as you inferred.  But the schedule that you propose is like

11    super rapid.  I would have to apply for transfer to the Eastern

12    District of Virginia if I were to adopt that particular

13    proposal.

14          MR. UDELL:  Your Honor, as I'm sure Mr. Sacca and Mr.

15    Blue will mention again, there is not a date at this moment set

16    for the annual meeting.  The annual meeting last year, the last

17    two years, I believe, was in September.  There are a panoply of

18    rules under New York law, under NASDAQ that apply here, the

19    long and short of which is that there is going to be an annual

20    meeting this fall.  Though a date is not set, the schedule that

21    we are proposing is designed to get a resolution and swift

22    justice to the claims raised in advance of such a meeting.

23          What you have here, as Mr. Wise has acknowledged, is a

24    proxy contest ongoing.  He is filing section 14a filings with

25    the SEC.  He is issuing a press release on a regular basis.  He

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E8irform

1   has issued a number of them since this case was filed in

2   connection with a state court litigation.  He is clearly

3   communicating with shareholders purposefully, I would submit.

4   It is for that reason that we ask that this thing be expedited

5   so that we can resolve it and the shareholders not be bombarded

6   with what we contend are misleading filings.

7           THE COURT:  Let me hear from defense counsel.

8           MR. SACCA:  I think, your Honor, you are quite right

9   that either way you come down on the injunction here, the

10   request for expedited discovery is moot.  Forward is in the

11   awkward position of saying over and over in their papers that

12   the existence of a 13d group is evident here, it is apparent,

13   it is obvious, and it is all based on facts that are public,

14   including the fact Mr. Udell has identified as the most

15   significant fact, that Ms. Yu works for Mr. Wise's company,

16   which is Forward's exclusive supplier.  That is in her 13D

17   itself.

18           Mr. Wise is not the only one advocating for

19   shareholders here.  I'm sure that is not surprise to you.  As

20   soon as it filed this lawsuit, in fact, Forward filed a press

21   release and then filed it on a 14A, blasting to shareholders

22   their allegations in this case.  No one is under any

23   misimpression that Forward now thinks Mr. Wise and Ms. Yu are a

24   group.  All the facts are out there.

25           Mr. Udell has said on a number of occasions before

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-69

30

E8irform

1   your Honor now the annual meeting is always in September.

2   That's not going to happen this year.  There is a reason for

3   that.  That is tactics, too.  There was a board meeting, I

4   understand, to discuss an annual meeting date, and no date was

5   set.  So the company is holding on to the annual meeting is

6   another tactical ploy.

7         Your Honor, this litigation shouldn't be used, it

8   shouldn't be another arrow in management's quiver in an attempt

9   to entrench itself.

10         THE COURT:  Though I'm not going to make any rulings

11   today from the bench, I'm leaning against expedited discovery

12   of the sort that plaintiff proposed in their case management

13   plan.  But I wasn't so keen on your response, which was let's

14   just wait till these motions are decided.  I'm going to decide

15   this motion expeditiously.  But why should we wait?  Why

16   shouldn't we set a case management plan today?

17         MR. SACCA:  Your Honor, the PSLRA has a discovery stay

18   in it.

19         THE COURT:  You are going to be filing a motion to

20   dismiss?

21         MR. SACCA:  We intend to.

22         THE COURT:  What is the ground for your motion to

23   dismiss?

24         MR. SACCA:  That the allegations as stated don't state

25   a claim under 13d or 14a.

SPA-70

E8irform

1      THE COURT:  The standard there is very different.  For

2   him to get an injunction, he has meet a very high standard.

3      MR. SACCA:  Yes, your Honor.

4      THE COURT:  For you to get the complaint dismissed,

5   what I think you are saying now is that no jury, no rational

6   juror, could plausibly find from the allegations that Mr. Wise

7   and Ms. Yu are in cahoots?

8      MR. SACCA:  Not just in cahoots, your Honor.  They

9   have to have an agreement with regard to the purchase or

10  acquisition of all of the Forward shares.

11     THE COURT:  Your saying no reasonable juror could --

12     MR. SACCA:  The only evidence, your Honor, is that

13  they have business relationships.  That's not good enough.

14  There are cases that say that.

15     THE COURT:  For example, and there is some circularity

16  here, if a jury concluded that Mr. Wise had lied when he said

17  he had no intent, you're saying oh, there were independent

18  things that happened, so that's why he changed his mind.  But

19  maybe a rational juror, maybe, could say, nah, he was thinking

20  about it already but he just didn't want to tell.  That would

21  by itself give rise to adverse inferences that might color

22  totally everything else in the case.

23     MR. SACCA:  I don't know that it would give rise to

24  adverse inferences, your Honor.

25     THE COURT:  Let's assume hypothetically that he lied.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-71

E8irform

1   He said, I have no intent of taking over the company, when in

2   fact he was saying to himself, I'm waiting till the right

3   moment and I'm going to take over this company, and then I'll

4   be on both sides because I'll be both supplier and purchaser.

5   From the fact that he lied in this hypothetical, why could one

6   not infer that he felt free to lie because he knew his

7   confederate was busy buying up those shares?

8           MR. SACCA:  I don't, your Honor, see the connection

9   between him lying and him feeling free to lie because she was

10  buying shares.  Whether she was or wasn't --

11          THE COURT:  She gave him his cover.

12          MR. SACCA:  But how?

13          THE COURT:  How?  Because, as you just told me, she

14  purchased her shares later.

15          MR. SACCA:  No.  She purchased her shares before.  In

16  your hypothetical, he lied.

17          THE COURT:  I'm sorry.  That is important.  Maybe I

18  did misunderstand the chronology.  I thought the chronology was

19  he first got his shares in this matter you mentioned and then

20  she got her shares.

21          MR. SACCA:  Yes.

22          THE COURT:  You are saying the lie came after both

23  those events?

24          MR. SACCA:  Yes, your Honor.  What Mr. Udell

25  characterized as a casual why don't you three guys look into

SPA-72

                                                                    33
E8irform

1    this process at the board, what really happened was immediately

2    after Ms. Yu filed her 13D he convened a board meeting.  At

3    that board meeting they accused Mr. Wise of being a part of the

4    group and having a plan to take control of the company.  This

5    casual committee was formed with resolutions empowering it to

6    hire at the company's expense counsel and experts and to compel

7    employees of the company to work with it.  It was not a casual

8    process.

9              THE COURT:  Let me go back to your putative motion to

10   dismiss.  How quickly could you file that motion?  I'm going to

11   try to give you all at least a bottom line ruling with opinion

12   to follow on the motions that we are arguing today, the three

13   motions, four motions, three, four, whatever, that are before

14   me right now by this Friday.  I won't have time to write an

15   opinion by then, but I'll give you the bottom line.

16             Let's assume for the sake of argument that I deny the

17   injunction.  How quickly could you file your motion to dismiss?

18             MR. SACCA:  Right now it's due the 28th.  Friday is

19   the 22nd.  We could file it that same day.  I'll be candid with

20   your Honor, if you grant an injunction, and I don't think you

21   should, I'm not going to move to dismiss.

22             THE COURT:  I understand.  That's different.  I'm

23   taking it now most favorably to you, so to speak.

24             MR. SACCA:  Right.

25             THE COURT:  I understand the PSLRA bar.  But we could

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

2767349-1

SPA-73

E8irform

1    enter into a case management plan today that says the motion

2    will be filed on such and such a day, it will be decided by

3    such and such a day, discovery will occur, assuming the motion

4    is not granted, on such and such a date.  There are a lot of

5    things we could do to play this all out.  The automatic stay

6    does not preclude us from setting a schedule.

7          MR. SACCA:  Right.  The 28th is six days after your

8    Honor has said you will give us a ruling.  If you would like us

9    to put the brief in earlier than that, we certainly can.

10         THE COURT:  No.  I can live with that.  You would file

11   your motion on the 28th.  How long would plaintiff's counsel

12   want for his answering papers?  This is all, again, assuming a

13   motion is filed.

14         MR. UDELL:  How about one week, the 5th.

15         THE COURT:  That's more than reasonable.  That would

16   be September 4th.

17         MR. UDELL:  I'm sorry.  I thought it was the 5th.  He

18   is getting his by the 28th.

19         THE COURT:  Yes.

20         MR. UDELL:  Maybe if we could have until the 5th.

21         THE COURT:  September 5th.  Then reply papers surely

22   could be done by September 10th, yes?

23         MR. SACCA:  Yes, your Honor.

24         THE COURT:  We could have oral argument on September

25   15th at 4 p.m., and I could get you again a bottom line

E8irform

1    decision with opinion to follow surely by September 19th.

2              Here is what I think makes sense.  I have no idea how

3    I'm going to rule on any of this stuff.  Assuming for the sake

4    of argument I deny the injunction, then we will have a motion

5    to dismiss on the schedule we all just agreed to.  Then I would

6    want you to have a case management plan jointly ready that

7    would have this case ready for trial by the end of the year,

8    much slower than plaintiff's counsel wanted but perhaps a

9    little faster than defense counsel had in mind.

10             You can work out mutually, and I don't think with the

11   kind of excellent counsel we have here that there would be a

12   problem in your having that ready for me, a case management

13   plan that would have everything done -- discovery, summary

14   judgment, and the 24 original motions that I can't even

15   contemplate someone is going to think about -- by the end of

16   the year.

17             MR. UDELL:  Your Honor, by the way, I share your

18   assessment of the collaboration.  In terms of counsel, we have

19   an excellent working relationship.  Whatever end date you give

20   us, I'm confident we can among ourselves work up all the

21   interim dates.

22             With respect to the end date, can I respectfully

23   request, in light of the urgency that we have been pressing in

24   this case, can we get a trial date of November at some point

25   and then work back from that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-75

E8irform

1          THE COURT:  I think November is really not in the

2    cards.  Among many other things, I have two trials during that

3    month and I have another trial starting December 1st.  I could

4    give you, and I know this is what you would really love, a

5    Christmas trial, something maybe in the middle of December.

6    I'm not saying no at this point.  I will think about it some

7    more.

8          I'm thinking end of December makes more sense.  We can

9    try the case right at the beginning of January.  December 31st

10   is a Wednesday.  I'm sure you would all be in position to start

11   at 9:00 a.m. on Thursday.  Anyway, we can worry about that at a

12   later point.

13         Yes, sir.

14   MR. SACCA:  Your Honor, I was going to mention on the

15   expeditious point.  This is really in the pecuniary interests

16   of my client, who, keep in mind, is an individual fighting for

17   the corporation in the context of a tender offer in a proxy

18   fight.  The annual meeting date is wholly within the control of

19   the company.  They haven't set one.  We are starting to have

20   the suspicion that they are not going to set one.

21         THE COURT:  I assume they are going to set it at the

22   date that maximizes their strategic advantage.  There is not

23   much I can do about that, is there?

24   MR. SACCA:  But what we don't have to do, your Honor,

25   is play into their request for urgency to get this resolved in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

37

E8irform

1   front of the meeting date when they control the time of the

2   meeting date and they haven't set it.

3        THE COURT:  That may be a reason for saying no to

4   November, and I'm probably going to say no to November anyway

5   just because of my trial schedule.  But there is nothing about

6   the case, when you consider the excellent attorneys -- and I

7   mean that most sincerely, I have been very impressed so far by

8   all counsel in this case -- and the fact that this is not like

9   a giant case with multiple issues and all like that, I don't

10  see any reason everything can't --

11       MR. SACCA:  Your Honor, please don't misunderstand.

12  If your Honor wants to try this case on January 1, we will be

13  here ready to try the case.

14       THE COURT:  I might give you a day more than that.

15       MR. SACCA:  My only concern is, as you are aware, it

16  is not inexpensive for my client for us to be able to do that

17  for him.  And because we are being told that the urgency here

18  is to resolve this in advance of an annual meeting that we are

19  growing suspicious the board is not going to schedule until a

20  court tells them they have to or until NASDAQ tells them we are

21  going to delist you if you don't --

22       THE COURT:  Here is where I want to leave this.  Then

23  we have one more motion we have to deal with.  If I deny the

24  injunction this Friday, then we will have the motion to dismiss

25  on the schedule we just made and I will expect counsel at the

38

E8irform

1   time of oral argument on that motion to present me with a
2   schedule that will have the case ready for trial by the end of
3   the year without prejudice to making arguments at the time of
4   oral argument as to why this is too short or too long.
5          MR. SACCA:  Absolutely.
6          THE COURT:  Let's turn to the last motion, which is
7   the defendant Yu's motion to strike portions of the complaint.
8   I guess my question is really for plaintiff's counsel.  This is
9   juicy stuff.  How does it relate to your causes of action?
10         MR. UDELL:  Your Honor, unlike the cases cited by the
11  defendant, the Saudi prejudice one, the allegations here go
12  directly to the heart of what the case is about and what Ms. Yu
13  is charged with in the complaint.  There is not a separate
14  count alleging insider trading, but the alleged use of material
15  nonpublic information for trading -- let me withdraw that.
16         The allegation is that she was trading at the time
17  that she was in the possession of material nonpublic
18  information.  The trading is the very trading that we are
19  talking about in this case that gives rise to the 13D.  It is
20  the very trading at the time that, as we are alleging, was not
21  disclosed.  The group was not disclosed.  She filed a 13D.
22  When she originally filed it, she didn't disclose her 60 days
23  worth of trading.  All of this is part and parcel of the
24  conduct that is alleged.
25         What she also did on those very same trades is trade

SPA-78

E8irform

1    after she had been to board meetings where she heard discussion

2    of board policy and company policy.  Secondly, she was in the

3    possession of information by virtue of her managing

4    directorship.

5         THE COURT:  She could be doing all of that independent

6    of being in concert with Mr. Wise.  How does it in any way

7    support your fundamental allegations in your causes of action

8    about the two of them acting in concert?

9         MR. UDELL:  Again, it is part and parcel of the

10   conduct which is alleged, which is that she has surreptitiously

11   and improperly concealed the fact that she is acting in a group

12   with him, the fact that she is also concealing by the very same

13   conduct, the fact that she is purchasing shares while in

14   possession of material nonpublic information, also, by the way,

15   in contravention of the insider trading policy of the company

16   which she is subject to as a managing director slash employee

17   of a director, who is Mr. Wise.

18        It is part and parcel of the same conduct and it is

19   the same story.  It is relevant for that purpose.  I think we

20   are entitled to present that evidence to a jury.  I'm sorry.

21   To the fact-finder I should say.  It also goes to, at the end

22   of the day, her credibility.

23        THE COURT:  I'm not sure what authority you have, for

24   example, to say that one can put into a complaint that alleges

25   a violation X stuff that, to pick up your latter point, might

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-79

E8irform

1      be admissible if she testifies at trial for purposes of

2      impeachment, although surely, since it would be extrinsic

3      evidence, it might be subject to severe limitations by the

4      Court.  On that theory, just about any allegation that someone

5      denies could go into a complaint and serve to smear the person

6      because it would still be admissible or arguably admissible at

7      trial on grounds of impeachment.

8              I have that same sort of question.  When you say it is

9      part and parcel, the same conduct, I'm not sure what that

10     means.  If I understand your position, she was acting in

11     concert with Mr. Wise, and, though it is the same trades,

12     unrelatedly she is trading on inside information.

13             It has nothing to do with the allegation that the two

14     of them are in a group seeking to gain role of the company.

15     Whether she purchased those shares trading on inside

16     information or purchased those shares not trading on inside

17     information, if she was acting in a group, that would be one

18     thing, and if she wasn't acting in a group, it would be the

19     other.  I don't see how that relates.

20             MR. UDELL:  It relates, your Honor.  Certainly there

21     is a separate articulable statute that we are not charging in

22     this complaint.  But the conduct is related.  When I say it is

23     part of the same story, she is learning this information by

24     virtue of her employment position working for Mr. Wise and by

25     virtue of her attendance at board meetings at the invitation of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-80

E8irform

1    Mr. Wise.  She is benefiting from this, acquiring this

2    information, by virtue of her association with Mr. Wise.  We

3    are then alleging that she is in cahoots, as the Court put it,

4    in cahoots.

5            THE COURT:  That's my legal term.

6            MR. UDELL:  That is the technical legal term for it.

7    But she is sharing a common objective with him with respect to

8    the shares.  I think we can draw the inference that she is

9    profiting, so to speak, from this illicit information which she

10   gets by virtue of her association with Mr. Wise.  That, among

11   other things, may give her yet an additional reason to vote

12   with him and join and agree with him in the common objective,

13   he who gave her access to this source of illicit profit, among

14   other reasons.

15           THE COURT:  Let me hear from your adversary.  Thank

16   you.

17           MR. BLUE:  Your Honor, like the Court, I just don't

18   understand the part and parcel term, which doesn't get more

19   clear in repetition.  In fact, I think it is inconsistent with

20   the 13d group claim to say that she is trading on inside

21   information that she got in the board meetings.

22           If she was in a group with Mr. Wise, I suspect Mr.

23   Wise would pick up the phone and tell her what happened at the

24   board meeting or tell her, oh, by the way, just go buy because

25   I want you to, which didn't happen.  The allegation that she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-81

42

E8irform

1  got information in the board meeting and by virtue of her

2  position as a supplier that led her to think that's a good

3  reason to buy the stock is inconsistent with the notion that

4  she is buying it because Terry Wise wants her to.  Not only is

5  it a stand-alone, but it is inconsistent.

6         The real problem for Ms. Yu on this, as we pointed out

7  in our letter, is the company is issuing a press release

8  saying, look, we sued Jenny Yu and we allege she violated the

9  securities laws by insider trading.  There is no way for her to

10 come into court and disprove that, because they haven't

11 actually sued her for that.  They get all the benefit of

12 claiming that she violated the securities laws without actually

13 suing her for that.  I think this is exactly the sort of case

14 that --

15         THE COURT:  Assuming I were to agree with all that,

16 what about the argument that, rightly or wrongly, the cat is

17 out of the bag, the allegation has been made, it's not like

18 this is being followed by the readers of the National Enquirer,

19 the shareholders know about this allegation, to the extent that

20 there is any financial press that's interested, they know about

21 it?  So what's the point of knocking it out now as a pleading

22 matter when, if there is anything to its impeachment value, it

23 will come back in at trial perhaps in any event?

24         MR. BLUE:  I think there is value in a couple of

25 places.  One is the rule is intended to keep irrelevant

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-82

E8irform

1    allegations out of the pleadings.  For instance, you can't say

2    I'm suing somebody for breach of contract and, oh, by the way,

3    he also beats his dog.  It may or may not be true, but you

4    can't just throw it in a pleading in order to get the

5    protection of privilege of making an allegation like that in a

6    court pleading where you are not responsible for the content.

7         The second thing, of course, your Honor, is that if we

8    have expedited discovery in this case, you know that we are

9    going to have discussions about what the appropriate scope of

10   discovery is.  Mr. Udell is going to ask for discovery related

11   to use of inside information, I'm sure.  One of the issues is

12   going to be is that an allegation in the complaint that we are

13   supposed to be defending against because it is in the pleading?

14   I think it has practical implications, especially on an

15   expedited schedule like you have suggested.

16        THE COURT:  I agree with much of what you say except

17   for the word "expedited," for which I would respectfully

18   substitute "leisurely."

19        Unless anyone else has anything to say on anything,

20   this has been a very helpful oral argument.  I will get you

21   bottom line decisions by close of business Friday on all these

22   motions.  Then we will proceed accordingly.  If I grant the

23   injunction, obviously, then it's a different scheduling type of

24   situation, and we will deal with that accordingly at that time.

25        Anything else that anyone wants to raise with the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2767349-1

SPA-83

E8irform

1    Court?

2              MR. UDELL:  No, your Honor.

3              MR. SACCA:  No, your Honor.

4              MR. BLUE:  No, your Honor.

5              THE COURT:  Very good.  Thank you so much.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2767349-1